## STATE OF HAWAII, Plaintiff-Appellee, *v.* PATRICK CONSTANTINO RUSSO, Defendant-Appellant

NO. 8425

(CR. NO. 54190)

APRIL 12, 1984

LUM, C.J., NAKAMURA, PADGETT, HAYASHI AND WAKATSUKI, JJ.

OPINION OF THE COURT BY NAKAMURA, J.

Patrick Constantino Russo appeals from a judgment of the Circuit Court of the First Circuit adjudging him guilty of two murders and sentencing him to life imprisonment for each. He contends the jury verdict finding him guilty of the murders is not supported by substantial evidence, the assistance provided him by trial counsel was ineffective, and the circuit court committed reversible error in several respects during the course of trial. Concluding from a review of the record that the trial court erred in not suppressing statements elicited from the defendant without the procedural safeguards designed to protect his privilege against self-incrimination and not excluding evidence obtained in violation of his right to be free of unreasonable searches and seizures, we vacate the convictions and remand the case for retrial.

I.

Shortly after 8:00 p.m. on January 16, 1980, a volley of four to seven shots was fired into the Sports Page Lounge, a bar situated on Kalakaua Avenue in Honolulu, and two of its patrons were killed by the gunfire. Witnesses at the scene of the crime reported a male in a white, late-model Chevrolet, bearing license plate number 9E-2961 or 9E-2962, was the gunman. An examination of three empty cartridges and fragments of lead projectiles recovered at the scene by the police established that the murder weapon was in all probability a .38 caliber pistol.

The investigating officers learned from motor vehicle registration records that the registered owner of the vehicles with the

foregoing license plates was an auto leasing company. The officers were subsequently informed by its manager that 9E-2961 was the license plate number of a white 1978 Chevrolet Nova then under lease to Jerome Gordon and 9E-2962 was that of another white '78 Nova leased to Patrick Constantino Russo. They were also given the lessees' residence addresses by the manager. Thus after interviewing the witnesses to the shootings, four officers, Detective Jeffrey Yamashita and three others, proceeded to seek out Gordon and Russo for questioning.

The officers first sought entry to the apartment building where Gordon reportedly resided. But the structure's security scheme prevented them from entering, so they drove to the apartment building where Russo lived. Since access to both the parking and the residential areas of the latter was unimpeded by security devices, the officers quickly located the Chevrolet Nova leased by Russo. When Detective Yamashita ran his hand over the Nova's front grill, he noted it was warm. The officers thereafter proceeded to the suspect's apartment at approximately 4:00 a.m.

When Russo appeared at the door, Detective Yamashita apprised him of the purpose for the early morning call. He was informed the police were investigating the shootings at the Sports Page Lounge and that descriptions given them of the vehicle driven by the suspected gunman matched that of the vehicle parked on the third floor of the apartment building. After excusing himself to change into more appropriate clothing, Russo reappeared and let the officers into the apartment.

He led the four officers to the living room, where the questioning commenced with inquiries unrelated to the crime under investigation. Yamashita then asked Russo about the 1978 Chevrolet Nova; the suspect's reply was that he had leased it on the preceding morning and he was the only one with present access to the vehicle. He acknowledged driving it the night before to and from a nearby drinking establishment and admitted he had been there from about 7:30 to 11:00 p.m. He denied being at the Sports Page Lounge. The detective followed up by asking Russo whether he owned a firearm. The query drew a response from the suspect that he had indeed purchased a handgun, also on the morning of January 16th.

Yamashita continued to pursue the matter by asking Russo

whether he had retained the sales slip for the transaction; whereupon the suspect produced a buyer's copy of the record of a charge to his MasterCard account for the purchase of the following: a .38 caliber Smith & Wesson Special revolver, some paper targets, two boxes of ammunition, a pair of binoculars, a sports bag, a pair of ear protectors, and cleaning equipment for a firearm. The next query related to the whereabouts of the purchased firearm, and the reply was that it was in the parked vehicle. A request to see the weapon followed, and Russo complied by leading the team of police officers to the area where the car was parked.

When the suspected gunman and the investigators reached the vehicle, he opened the trunk, peered in, and exclaimed, "someone set me up." He then stepped back and again cried out, "someone set me up." Thereupon, Yamashita looked into the trunk, turned to Russo, and inquired what the cryptic outcry was meant to convey. Russo's explanation was that the firearm was not where he had expected it would be. Upon further prodding by the police officers on where the gun might be, he stated it could be in the apartment. He then closed the trunk, and the group returned to the apartment.

But a thorough search of the suspect's living quarters failed to uncover the revolver he admitted purchasing, and his formal arrest for the murders of the two bar patrons was effected at approximately 4:30 a.m. At no time during the thirty-minute interrogation preceding the arrest was he apprised that he had a right to remain silent and anything he said could be used against him in a court of law; nor was he advised he could have an attorney present or that if he could not afford one, counsel would be appointed for him.[1]

While being transported to the police station thereafter in Yamashita's custody, the defendant was asked if he would be willing to execute a consent to the search of the apartment and the leased vehicle. Russo's retort was: "I gave you verbal consent and I won't sign any papers." Subsequently, however, other police officers carried on a warrantless search and examination of the car and seized the contents of its trunk compartment, as well as a pair of sunglasses from the passenger compartment.

---

[1] It was only after Russo was booked at the police station that he was informed of his *Miranda* rights; this occurred at approximately 8:30 a.m. on January 17th.

The defendant was indicted in due course on two counts of murder. At trial, he moved to suppress the incriminatory statements made in the course of the early morning interview conducted by the police on January 17, 1980. He also sought to exclude from trial the evidence seized from the leased vehicle's trunk compartment, the copy of the MasterCard charge slip he had given Yamashita, the sunglasses recovered from the vehicle, and the findings of any examination or analysis conducted of the vehicle and its contents. The circuit court overruled the foregoing requests and all of the foregoing evidence, except the purported findings, was presented to the jury along with eye-witness testimony and other evidence gathered by the police.

The jury returned a verdict finding the defendant guilty of both counts of murder, and the circuit court sentenced him to life imprisonment on each. He appeals to this court, claiming there are valid grounds ranging from an insufficiency of evidence to convict him to the incompetency of his trial counsel for a reversal of the convictions.

## II.

We are convinced from a review of the record that of the host of issues raised on appeal, only those related to the denial of the requests to exclude the defendant's statements to the police and the other evidence obtained through the warrantless search of the leased automobile are worthy of serious consideration. We begin with a discussion of *Miranda v. Arizona*, 384 U.S. 436 (1966), and the procedural safeguards that must be employed before statements stemming from custodial interrogation of the defendant may be used by the prosecution.

## A.

The Fifth Amendment to the United States Constitution and Article I, § 10 of the Hawaii Constitution provide in part that:

No person shall . . . be compelled in any criminal case to be a witness against himself (oneself) . . . .

This keystone of "our accusatory system of criminal justice demands that the government seeking to punish an individual pro-

duce the evidence against him by its own independent labors, rather than by the . . . expedient of compelling it from his own mouth." *Miranda v. Arizona,* 384 U.S. at 460. Recognizing that the demand can be fulfilled only when a person is guaranteed the right "to remain silent unless he chooses to speak in the unfettered exercise of his own will," *Malloy v. Hogan,* 378 U.S. 1, 8 (1966), the Supreme Court laid down a rule that "the prosecution may not use statements,. whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." *Miranda v. Arizona,* 384 U.S. at 444. For in the Court's opinion, the atmosphere of in-custody questioning "carrie[d] its own badge of intimidation." *Id.* at 457.

The Court went on to spell out what it meant by "custodial interrogation" and what safeguards were to be employed to effectuate a guarantee of the privilege to remain silent in the face of accusation, if one chose to. It defined the pertinent term as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way."[2] *Id.* at 444 (footnote omitted). And it decreed that the following measures to apprise an accused person of his right to silence and to assure a continuous opportunity for its exercise were necessary before a statement could be used as evidence at trial:

> He must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires. Opportunity to exercise these rights must be afforded to him throughout the interrogation.

*Id.* at 479.

The relevant rulings of this court have been faithful to the foregoing commandments regarding the admissibility of state-

---

[2] The footnote at this point of the Court's opinion reads:

This is what we meant in *Escobedo* when we spoke of an investigation which had focused on an accused.

Miranda v. Arizona, 384 U.S. at 444 n.4.

ments stemming from custodial interrogation. *See, e.g., State v. Paahana,* 66 Haw. 499, 502-03, 666 P.2d 592, 595 (1983); *State v. Melemai,* 64 Haw. 479, 481, 643 P.2d 541, 543 (1982); *State v. Sugimoto,* 62 Haw. 259, 264-65, 614 P.2d 386, 391 (1980); *State v. Kalai,* 56 Haw. 366, 368, 537 P.2d 8, 11 (1975). This is not to say the rulings have been entirely consistent with subsequent decisions of the Supreme Court expounding *Miranda.*

In *State v. Santiago,* 53 Haw. 254, 265, 492 P.2d 657, 664 (1971), we chose not to follow the Supreme Court's lead in *Harris v. New York,* 401 U.S. 222 (1971), where it held that statements obtained in violation of the standards proclaimed in *Miranda,* though inadmissible in the prosecution's case in chief, were nonetheless admissible to impeach the credibility of a defendant who elected to testify. Our ruling in *Santiago* was "that unless . . . [the] protective measures [delineated in *Miranda*] are taken, statements made by the accused may not be used either as direct evidence in the prosecutor's case in chief or to impeach the defendant's credibility during rebuttal or cross-examination." *Id.* We reasoned that the rights fashioned by our constitutional drafters were not necessarily circumscribed by the dictates of federal law and expressly held "the protections which the United States Supreme Court enumerated in *Miranda* have an independent source in the Hawaii Constitution's privilege against self-incrimination." 53 Haw. at 266, 492 P.2d at 664. Consequently, when claims of *Miranda* violations are advanced, we are constrained to seek primary guidance from precepts enunciated in the seminal decision, which have been incorporated into Article I, § 7 of our constitution, and our own cases rather than from later federal decisions like *Harris v. New York, supra.*[3]

## B.

*Miranda* rights, as noted earlier, are triggered whenever "questioning [is] initiated by law enforcement officers after a person has

---

[3] We are not alone in this regard; the supreme courts of California and Pennsylvania have also rejected the precedent established by *Harris v. New York.* The refusal to follow the Supreme Court in each case was premised on the self-incrimination clause of the state constitution. *See* People v. Disbrow, 16 Cal. 3d 101, 113, 545 P.2d 272, 280, 127 Cal. Rptr. 360, 368 (1976) (en banc) (overruling People v. Nudd, 12 Cal. 3d 204, 524 P.2d 844, 115 Cal. Rptr. 372 (1974) (en banc) (adopting *Harris*), *cert. denied,* 420 U.S. 1004 (1975)); Commonwealth v. Triplett, 462 Pa. 244, 249, 341 A.2d 62, 64 (1975).

been taken into custody or otherwise deprived of his freedom of action in any significant way." *Miranda v. Arizona,* 384 U.S. at 444 (footnote omitted). Of course, the State does not deny the defendant was subjected to questioning; however, it claims the statements used against him were elicited before he was taken into custody. Yet an arrest is hardly a "condition precedent" to custodial interrogation, and questioning in a setting as familiar to the defendant as his residence may still be custodial in character. *State v. Kalai,* 56 Haw. at 369, 537 P.2d at 11; *see also Orozco v. Texas,* 394 U.S. 324, 327 (1969).

Interrogation giving rise to *Miranda* rights is questioning of "a nature that would ' "subjugate the individual to the will of his examiner" and thereby undermine the privilege against compulsory self-incrimination.' *Rhode Island v. Innis,* 446 U.S. 291, 299 (1980) (quoting *Miranda v. Arizona,* 384 U.S. at 457-58)." *State v. Paahana,* 66 Haw. at 502, 666 P.2d at 595. And in deciding whether questioning was carried on "in a custodial context, the totality of circumstances must be considered, including the time, place and length of the interrogation, the nature of the questions asked, the conduct of the police at the time of the interrogation, and any other pertinent factors." *Id.* at 502-03, 666 P.2d at 595 (citations omitted). Among the other pertinent factors "to be considered are whether the investigation has focused on the suspect and whether the police have probable cause to arrest him prior to questioning." *State v. Melemai,* 64 Haw. at 481, 643 P.2d at 544.[4] Due consideration of all the circumstances surrounding the early morning encounter between the law enforcement officers and the suspect leads us to conclude the interrogation, while inceptively innocuous, had prog-

---

[4] We deemed both of these factors of import, as the following excerpt from *State v. Melemai* demonstrates:

> While focus of the investigation upon the defendant, standing alone, will not trigger the application of the *Miranda* rule, it is an important factor in determining whether the defendant was subjected to custodial interrogation. *State v. Patterson, supra* at 361, 581 P.2d at 755; *State v. Kalai, supra* at 369, 537 P.2d at 11. Probable cause to arrest is also not determinative, but it may play a significant role in the application of the *Miranda* rule. *State v. Patterson, supra* at 361, 581 P.2d at 755; *People v. Diego,* 121 Cal. App. 3d 777, 175 Cal. Rptr. 553, 555-56 (1981).

64 Haw. at 481, 643 P.2d at 544.

ressed to a point where *Miranda* warnings were definitely in order before he was booked at the police station.

## C.

When Russo opened the door to his apartment at 4:00 a.m. on January 17, 1980, he was confronted by four police officers. He was told they were engaged in an investigation of the shootings at the Sports Page Lounge and descriptions of the vehicle driven by the suspected gunman matched that of the automobile presumably under his control. The officers then entered the small apartment and proceeded to question him. After the usual preliminary inquiries, the questioning quickly centered on the crime then under investigation. In short order, evidence of the suspect's purchase of a handgun and that it was of the same caliber as the suspected murder weapon was brought to light. The succeeding query on the whereabouts of the handgun drew a response that it was ensconced in the vehicle parked on the third floor of the apartment building. At this juncture the probe undoubtedly focused on Russo, and his freedom of action definitely was restricted.[5] Any statement he made thereafter was clearly the product of custodial interrogation.[6]

---

[5] This is confirmed by Detective Yamashita's own appraisal of the situation. The relevant testimony reads:

MS. FUTA: Okay. Detective Yamashita, why did you arrest Patrick Russo at the point that you did and not before or later?

DETECTIVE YAMASHITA: Well, during the investigative inquiry with Mr. Russo, I felt that I had enough probable cause due to the fact that the vehicle in question had transported a weapon according to Mr. Russo and that he had purchased a weapon, a .38 caliber Special revolver. And I had known at that time that we had found fragments or lead projectiles at the scene that indicated that [a] .38 caliber weapon was used. And I felt at that time we had enough probable cause to arrest him.

The foregoing testimony establishes that all of the information the detective relied on in determining there was cause to believe Russo had committed the murders had been secured at this point. This was before the officers and their "quarry" proceeded downstairs to the parked vehicle. Yet the required recitation of warnings to the defendant took place four hours later at the police station. By then, a recitation of *Miranda* rights could hardly have been an effective means to protect the defendant's privilege against compulsory self-incrimination; it was more than likely mere litany.

[6] The conclusion that the questioning developed into custodial interrogation when the officers were told the purchased handgun was in the vehicle parked downstairs would, of course, render the information and evidentiary material Russo had given them earlier admissible as evidence at trial.

Although the suspect was in the familiar environment of his own habitat, he was in the intimidating presence of four police officers who were on the trail of a murderer. Moreover, the hour was late (or early), and they had already secured solid evidence linking him to the crime being probed. It was unreasonable for him to think he could have ushered them out of the apartment even if he wanted to; nor were they about to leave, for they had just been handed proof of the purchase of the possible murder weapon by the suspect himself. Since Russo could not have had a reasonable belief that he was "free to go," we can only conclude he had then been "deprived of his freedom of action in . . . [a] significant way." *Miranda v. Arizona,* 384 U.S. at 444.[7]

### III.

We proceed from the statements elicited in violation of defendant's *Miranda* rights to the warrantless intrusions into the trunk compartment and interior of the Chevrolet Nova and consider the admissibility of what was gathered thereby.

### A.

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures"; Article I, § 7 of the Hawaii Constitution more explicitly provides that "[t]he right of the people

---

[7] The need for protective devices to make the process of police interrogation conform to constitutional requirements was initially stressed in Escobedo v. Illinois, 378 U.S. 478 (1964), where a defendant's sixth amendment right to counsel was implicated. There, the Supreme Court implied the starting point of custodial interrogation was when "the investigation is no longer a general inquiry into an unsolved crime but has begun to focus on a particular suspect." *Id.* at 490. This was confirmed in *Miranda* where the Court held that custodial interrogation was "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way" and equated the starting point of custody with *focus* of the investigation on the accused. *See* note 2 *supra.* Thus, *Miranda v. Arizona* read in conjunction with *Escobedo v. Illinois* buttresses our conclusion that it was incumbent upon the police to inform the defendant of his *Miranda* rights when they learned from the defendant that he had purchased a .38 caliber revolver and that it was in the leased vehicle.

to be secure in their persons, houses, papers and effects against unreasonable searches, seizures *and invasions of privacy* shall not be violated." "Over and again . . . [the Supreme] Court has emphasized that the mandate of the [Fourth] Amendment requires adherence to judicial processes," *United States v. Jeffers,* 342 U.S. 48, 51 (1951) (citations omitted), and that "searches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment — subject only to a few specifically established and well-delineated exceptions." *Katz v. United States,* 389 U.S. 347, 357 (1967) (footnotes omitted). These teachings, of course, are oft repeated in our decisions. *See, e.g., State v. Jenkins,* 62 Haw. 660, 662, 619 P.2d 108, 110 (1980); *State v. Elderts,* 62 Haw. 495, 498, 617 P.2d 89, 92 (1980); *State v. Kender,* 60 Haw. 301, 307, 588 P.2d 447, 451 (1978).

The State does not dispute that there were warrantless searches; but it asserts the defendant consented to the intrusions into his personal effects. Granted, a search premised on consent is a recognized exception "to the well-established rule that all searches conducted without a warrant are deemed to be unreasonable *per se.* *Schneckloth v. Bustamonte,* 412 U.S. 218, 219 (1973)." *Nakamoto v. Fasi,* 64 Haw. 17, 21, 635 P.2d 946, 951 (1981). Yet, "[c]onsent in the constitutional sense . . . means more than the absence of an objection from the individual being subjected to a search. It must be shown that such consent was, in fact, freely and voluntarily given. *State v. Patterson,* 58 Haw. 462, 467, 571 P.2d 745, 748 (1977)." *Id.* And the government's burden of demonstrating it was so "is particularly heavy in cases where the individual is under arrest." *Judd v. United States,* 190 F.2d 649, 651 (D.C. Cir. 1951).

### B.

Whether consent to a search was freely and voluntarily given, as in a case where custodial interrogation may be implicated, must be determined from the totality of circumstances surrounding the defendant's purported relinquishment of a right to be free of unreasonable searches and seizures. *State v. Merjil,* 65 Haw. 601, 605, 655 P.2d 864, 868 (1982); *see also Nakamoto v. Fasi,* 64 Haw. at 21, 635 P.2d at 951. Upon an earlier review of the factors bearing on the early morning interview, we concluded it quickly developed into a

confrontation in an inherently coercive setting. The same factors impel a conclusion that the State has not met its burden of showing the defendant voluntarily consented to the invasion of the trunk and passenger compartments of the Chevrolet Nova by police officers seeking proof of his guilt.

The particular quests for evidence followed the defendant's arrest and Yamashita's abortive attempt to secure a written consent, which drew this response from Russo, "I gave you verbal consent and I won't sign any papers." While assent could be inferred from these words, the context in which they were uttered leads us to believe they did not represent an essentially free and unrestrained choice. Furthermore, though "knowledge of a right to refuse is [not] an indispensable element of a valid consent," *Schneckloth v. Bustamonte,* 412 U.S. at 246, that a person "was not so advised is nevertheless a factor to be considered in evaluating the totality of circumstances as they bear upon the question of whether such consent was freely and voluntarily given." *Nakamoto v. Fasi,* 64 Haw. at 21, 635 P.2d at 951. Since the State has failed to establish that consent was given freely and voluntarily, the evidence obtained in the warrantless searches of the trunk and passenger compartments of the leased vehicle should have been excluded.[8]

## IV.

The State, in the alternative, argues any error regarding the admissibility of evidence was harmless; it contends Russo was convicted on the strength of other evidence adduced at trial, particularly the testimony of witnesses to the shootings. Thus, the question is whether the properly admissible evidence was such that the admission of the statements made after Russo told the police officers that the revolver he had purchased was in the parked vehicle, as well as the evidence subsequently seized from the vehicle, could not

---

[8] Although consent was the basis of the State's claim that the searches were valid, the circumstances indicate there are arguable grounds for a claim of validity under the "open-view" doctrine with respect to the sunglasses. But "open-view" *per se* provides no basis for a warrantless search or seizure; for "no amount of probable cause can justify a warrantless search or seizure absent exigent circumstances." State v. Kapoi, 64 Haw. 130, 141, 637 P.2d 1105, 1114 (1981). No exigent circumstances were demonstrated here.

have affected the jury verdict. In short, we are called upon to decide whether the improper addition of evidence was "harmless beyond a reasonable doubt." *State v. Perez,* 64 Haw. 232, 234, 638 P.2d 335, 337 (1981). A review of the record, however, fails to convince us that the improperly admitted evidence was "harmless surplusage." *Bumper v. North Carolina,* 391 U.S. 543, 554 (1968) (Harlan, J., concurring).

The convictions are reversed and the case is remanded for further proceedings not inconsistent with this opinion.

*Richard T. Pafundi* for appellant.

*Vicente F. Aquino,* Deputy Prosecuting Attorney, for appellee.