861 P.2d 736 (1993)
STATE of Hawaii, Plaintiff-Appellant,
v.
Michael BLACKSHIRE, Defendant-Appellee.
Nos. 15894, 16194.
Intermediate Court of Appeals of Hawaii.
May 10, 1993.
Certiorari Granted June 10, 1993.[*]
Amended on Reconsideration After Remand October 27, 1993.
Certiorari Denied November 17, 1993.
*738 James T. Carter, Deputy Prosecuting Atty., County of Maui, on the brief, Wailuku, for plaintiff-appellant in No. 15894.
Linda C. Ramirez, Deputy Public Defender, on the brief, Honolulu, for defendant-appellee in No. 15894.
Theodore Y.H. Chinn, Deputy Public Defender, on the briefs, Honolulu, for defendant-appellant in No. 16194.
Lillian B. Koller, Deputy Prosecuting Atty., County of Maui, on the brief, Wailuku, for plaintiff-appellee in No. 16194.
Before BURNS, C.J., HEEN and WATANABE, JJ.

ORDER AMENDING OPINION OF THE COURT

Oct. 27, 1993
On May 10, 1993, we filed one published opinion deciding Appeal No. 15894 and Appeal No. 16194. On June 10, 1993, the Hawaii Supreme Court entered an order remanding Appeal No. 16194 to us for reconsideration. Upon reconsideration, we replace that part of our May 10, 1993 published opinion under the heading "APPEAL NO. 16194" with the following. In all other respects, our May 10, 1993 published opinion remains the same. The headnotes, the part under the heading "APPEAL NO. 15894", and the "CONCLUSION" remain unchanged.
The May 10, 1993 published opinion under the heading "APPEAL NO. 16194" is amended to read as follows:
[Editor's Note: The amendments have been incorporated into the published opinion.]
BURNS, Chief Judge.
The State of Hawaii's (the State) August 28, 1991 complaint charged defendant Michael Blackshire (Blackshire) with Count 1, Promoting a Dangerous Drug in the Third Degree, Hawaii Revised Statutes (HRS) § 712-1243(1); Count 2, Prohibited Acts Related to Drug Paraphernalia, HRS § 329-43.5(a); Count 3, Promoting a Dangerous Drug in the First Degree, HRS § 712-1241(1)(a)(i); and Count 4, Prohibited Acts Related to Drug Paraphernalia, HRS § 329-43.5(a).
Appeal Nos. 15894 and 16194 were consolidated for decision because they arise from the same case and involve the same appellant and appellee.
The May 6, 1992 judgment convicted Blackshire of Counts 3 and 4. The December 24, 1991 pretrial suppression order that caused the demise of Counts 1 and 2 (December 24, 1991 Order) is the subject of the State's appeal in No. 15894. We affirm the December 24, 1991 Order.
*739 The April 24, 1992 pretrial order denying Blackshire's September 30, 1991 motion to suppress the evidence of Counts 3 and 4 (April 24, 1992 Order) is the subject of Blackshire's appeal in No. 16194. We affirm the April 24, 1992 Order.

APPEAL NO. 15894
The State appeals the circuit court's December 24, 1991 Order granting Blackshire's September 30, 1991 motion to suppress "all statements allegedly made by [Blackshire] to the Maui County Police on or about August 16, 1991 at approximately 0033 hours, and at the Maui Islander Hotel on August 15, 1991, or at any other time[,]... [and] any evidence recovered as a result of those statements[.]" We affirm.
The State does not challenge any of the circuit court's December 24, 1991 findings of fact. They are in relevant part as follows:
1. [Blackshire] was known to Officer David Lake from an incident on August 7, 1991 when an investigation at Kahana Villas Condominiums revealed that [Blackshire] had left the Kahana Villas condominium without paying for his room. While the hotel staff was packing up [Blackshire's] belongings, cocaine residue and paraphernalia were found, as well as some documents that revealed that [Blackshire] might be at the Maui Islander Resort.
2. Officer Lake called Ms. Linda Winters, Manager of the Maui Islander Resort, on August 9, 1991 and advised her to be on the lookout for [Blackshire]. Ms. Winters informed Officer Lake that [Blackshire] was at that time a paying guest of the Resort.
3. On August 15, 1991 at approximately 11:30 a.m., Ms. Winters called Officer Lake....
4. Officer Lake arrived at the Maui Islander Resort at approximately 12:45 p.m. on August 15, 1991 with Officer Michael Kahoohanohano.
5. Ms. Winters had requested Officer Lake's presence when the hotel safe was opened because it was jammed, and hotel staff could not open it to remove its contents. Ms. Winters suspected that the contents may be drug related.
6. Officer Lake met with Ms. Winters at the Maui Islander Resort, and went with her to Room A-1129. [Blackshire] had been the registered guest of that room, but at the time Officer Lake entered with Ms. Winters, the room was unoccupied in that the Maui Islander staff had already removed [Blackshire's] belongings and had placed them in storage.
* * * * * *
8. Officer Mark Joaquin and Sergeant Kaaikala arrived at the Maui Islander Resort at about 1:00 p.m. on August 15, 1991 with a narcotics sniffing dog, which alerted to the presence of drugs in the safe in Room A-1129.
* * * * * *
12. Ms. Winters notified Officer Lake that [Blackshire] was at the front desk of the hotel trying to pay for his bill after Officer Lake was informed of the positive dog alert.
13. [Officer Lake] and Sergeant Kaaikala... approached [Blackshire] on the lawn of the Maui Islander Resort at approximately 1:20 p.m. on August 15, 1991.
14. As Officer Lake approached [Blackshire] who was seated on the lawn of the Maui Islander Resort, he believed the [person] was [Blackshire], because of information about [Blackshire's] appearance provided earlier by Officer Tivoli Faaumu, that [Blackshire] was a black male, over 6'3", over 200 pounds.
15. On August 12, 1991, Officer Lake had also received an anonymous tip from Crime Stoppers dated August 10, 1991. The information related that a black male named Michael, approximately 6 foot, and in excess of 200 pounds had just come to Maui from the mainland with a large load of cocaine and was possibly staying at a Wailuku residence. Officer Lake believed that [Blackshire] was the subject of the Crime Stoppers['] tip.

*740 16. Officer Lake introduced himself to [Blackshire] as a police officer with the vice narcotics section, and produced his police identification and badge which he showed to [Blackshire]. Officer Lake then introduced Sergeant Kaaikala to [Blackshire].
17. When he first approached [Blackshire] on the lawn, Officer Lake believed he had probable cause to arrest [Blackshire] because the dog had already alerted to the safe, and Officer Lake believed [Blackshire] was the person responsible for Room A-1129.
18. Neither Officer Lake nor Sergeant Kaaiakala advised [Blackshire] of his Miranda warnings [sic] during the encounter on the lawn of the Maui Islander Resort.
19. Officer Lake asked [Blackshire] "if he didn't mind if we talked to him for a few minutes." [Blackshire] replied "no problem."
20. Officer Lake then asked [Blackshire] if his name was Michael Blackshire and [Blackshire] replied "yes."
21. Officer Lake then asked [Blackshire] to produce identification....
22. [Blackshire] reached into a large brown bag on the ground next to him and removed a brown wallet containing a California driver's license, which [Blackshire] gave to Officer Lake.

* * * * * *
24. Officer Lake asked [Blackshire] if he had a Maui residence....
25. [Blackshire] replied that the address on his driver's license was his current residence.
26. Officer Lake asked [Blackshire] if he had a phone number. [Blackshire] gave Officer Lake his California area code and phone number.
27. Officer Lake asked [Blackshire] where he was staying in Maui. [Blackshire] replied that he was staying at the Maui Islander Resort, Room A-1129.
28. Sergeant Kaaiakala then asked [Blackshire] if he was carrying any narcotics. [Blackshire] replied that he was not.
29. After [Blackshire] denied carrying narcotics, Sergeant Kaaikala asked [Blackshire] for permission to search inside his bag.
30. [Blackshire] said, "no problem" and allowed Sergeant Kaaikala to search the bag. Sergeant Kaaikala recovered from the bag a clear plastic zip lock bag with white powder residue and four other zip lock bags in various sizes. Also recovered was a rolled up aluminum foil wrapper, which was burned on one end, and a yellow metal bowl or scoop which had white powder residue.
31. [Blackshire] was then placed under arrest for promoting dangerous drugs in the third degree and prohibited acts related to drug paraphernalia at approximately 1:25 p.m. on August 15, 1991.
* * * * * *
33. Officer Lake then informed [Blackshire] that the police were conducting an investigation in Room A-1129 and that the police were going to apply for a search warrant for the hotel safe in that room.
* * * * * *
36. At 12:30 a.m. on August 16, 1991 Officer Lake awakened [Blackshire] at the Lahaina Police station to execute a warrant of arrest for Promoting a Dangerous Drug in the Third Degree and Prohibited Acts Related to Drug Paraphernalia.
* * * * * *
38. After Officer Lake obtained the search warrant for the hotel room safe, the warrant was executed at approximately 9:15 p.m. on August 15, 1991. The execution of the warrant was completed at 9:40 p.m.
* * * * * *
40. [Blackshire] was awake[ne]d in his cell at the Lahaina Police Station by Officers Lake and Faaumu for questioning about 12:30 a.m. on August 16, 1991.
* * * * * *

*741 42. [Blackshire] was advised of his Miranda rights by Officer Lake using M.P.D. Form 103.
43. Police ... informed [Blackshire] that his bail was being set at $10,000.00.
* * * * * *
45. [Blackshire] signed the M.P.D. Form 103 at 12:33 a.m. on August 16, 1991, indicating that he understood his rights and wished to make a statement.
46. No threats, promises or coercion were used to obtain a statement from [Blackshire].
47. Police thereafter interrogated [Blackshire] for half an hour or forty-five minutes, during which [Blackshire] never requested an attorney.
* * * * * *
51. During the interrogation period, [Blackshire] was first questioned about the Promoting Dangerous Drugs in the Third Degree and Paraphernalia cases, and made statements on these matters before he was informed of the recovery of the cocaine contents from the safe.
52. [Blackshire] was then informed that he was not being charged for those cases involving the recovery from the safe, since there was a continuing investigation ongoing.
53. [Blackshire] was asked whether he wished to discuss the matters regarding the safe in hotel room A-1129, but he did not wish to do so.
A person's Miranda rights are based on the constitutional privilege against self-incrimination. A person must be advised of the person's Miranda rights before the person is subjected to "custodial interrogation." Rhode Island v. Innis, 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980); State v. Nelson, 69 Haw. 461, 748 P.2d 365 (1987). Custodial interrogation involves two requirements: (1) interrogation and (2) custody. These two requirements sometimes overlap.
In 1984, the Hawaii Supreme Court wrote the following on the subject of interrogation:
Interrogation giving rise to Miranda rights is questioning of "a nature that would `"subjugate the individual to the will of his examiner" and thereby undermine the privilege against compulsory self-incrimination.' Rhode Island v. Innis, 446 U.S. 291, 299[, 100 S.Ct. 1682, 1688, 64 L.Ed.2d 297] (1980) (quoting Miranda v. Arizona, 384 U.S. [436, 457-58, 86 S.Ct. 1602, 1618-19, 16 L.Ed.2d 694])." State v. Paahana, 66 Haw. [499] at 502, 666 P.2d [592] at 595. And in deciding whether questioning was carried on "in a custodial context, the totality of circumstances must be considered, including the time, place and length of the interrogation, the nature of the questions asked, the conduct of the police at the time of the interrogation, and any other pertinent factors." Id. at 502-03, 666 P.2d at 595 (citations omitted). Among the other pertinent factors "to be considered are whether the investigation has focused on the suspect and whether the police have probable cause to arrest him prior to questioning." State v. Melemai, 64 Haw. at 481, 643 P.2d at 544.
State v. Russo, 67 Haw. 126, 134, 681 P.2d 553, 560 (1984) (footnote omitted).
Interrogation is distinguished from conversation and general on-the-scene questioning. The Hawaii Supreme Court has observed:
At what point police interrogation ceases to be permissible general on-the-scene questioning and becomes custodial interrogation, prohibited under Miranda without prior warnings, is at the crux of the problem in these situations. See, generally, Annotation, 31 A.L.R.3d 565. No precise line can be drawn because each case must necessarily turn upon its own facts and circumstances, but we think that the California court in People v. Manis, 268 Cal.App.2d 653, 669, 74 Cal.Rptr. 423, 433 (1969) came as close as any to delineating, generally, the outer parameters beyond which on-the-scene interviews may not proceed without the Miranda warnings:
"[P]ersons temporarily detained for brief questioning by police officers *742 who lack probable cause to make an arrest or bring an accusation need not be warned about incrimination and their right to counsel, until such time as the point of arrest or accusation has been reached or the questioning has ceased to be brief and casual and become sustained and coercive."
State v. Patterson, 59 Haw. 357, 362-63, 581 P.2d 752, 755-56 (1978).
Therefore, interrogation does not occur during an investigative stop when "the police, in the exercise of their investigatory duties or functions, ... [make] general on-the-scene inquiries as to facts surrounding a crime or other general questions in the fact-finding process." State v. Melemai, 64 Haw. 479, 481-82, 643 P.2d 541, 544 (1982) (citation omitted).
Similarly, during an investigative stop or after an arrest, requests for items of information within the "routine booking question exception" are not, in most cases, interrogation. These items of information are: name, address, height, weight, eye color, date of birth, current age, Pennsylvania v. Muniz, 496 U.S. 582, 110 S.Ct. 2638, 110 L.Ed.2d 528 (1990), and, logically, social security number.
However, conversation and general on-the-scene questioning ends, interrogation begins, and the routine booking question exception does not apply: (1) when the police request information designed to elicit an incriminatory admission; or (2) where the police should have known that their communication was reasonably likely to elicit an incriminating response. Rhode Island v. Innis, 446 U.S. at 301, 100 S.Ct. at 1689[, 64 L.Ed.2d at 308]; United States v. Henley, 984 F.2d 1040 (9th Cir.1993); State v. Roman, 70 Haw. 351, 772 P.2d 113, cert. denied, 493 U.S. 944, 110 S.Ct. 349, 107 L.Ed.2d 337 (1989).
A person who has been "seized" or "arrested" is, by definition, in "custody." However, deciding whether a person who has not been physically overpowered has been "seized" is not a simple task. For example, interrogation may cause a person to be "seized."
Where the police, prior to questioning the individual, are in possession of facts sufficient to effect an arrest without a warrant based on probable cause, it is less likely that the person confronted would be allowed to come and go as he [or she] pleases. The degree of this likelihood may, of course, depend upon the nature and gravity of the offense, as well as other circumstances. In any event, whether the defendant was in custody or otherwise deprived of his [or her] freedom of action for Miranda purposes is to be determined from the totality of the circumstances, objectively appraised.... These would include the place and time of the interrogation, the length of the interrogation, the nature of the questions asked, the conduct of the police, and all other relevant circumstances.
Patterson, 59 Haw. at 361, 581 P.2d at 755 (citations omitted).
Since a person who has been "seized" is in "custody," the Hawaii Supreme Court's opinion in State v. Quino, 74 Haw. 161, 840 P.2d 358 (1992), cert. denied, ___ U.S. ___, 113 S.Ct. 1849, 123 L.Ed.2d 472 (1993), is relevant, notwithstanding the fact that it was decided in the search and seizure context rather than in the privilege against self-incrimination context. Quino concluded that a seizure of the person commences, as a matter of law, once a police/person in-person encounter "turn[s] from general to inquisitive questioning[.]" 74 Haw. at 173, 840 P.2d at 364. A police/person in-person encounter turns from general to inquisitive questioning when the questions become "more intrusive and accusatory in nature." Consequently, a person is in custody when a Quino seizure occurs.
In Blackshire's case, the reason for the circuit court's suppression order was expressed in conclusion of law No. 3 as follows:
3. A person does not have to be under formal arrest for Miranda to apply. State v. Russo, 67 Haw. 126, 681 P.2d 553 (1984).

*743 Although [Blackshire] was not yet under formal arrest at the time he was approached on the lawn of the Maui Islander Resort, the police had ample probable cause to arrest him at that time based on the positive dog alert on the safe in room A-1129 and the Crime Stopper's [sic] tip received by the vice narcotics section of the Maui Police Department on August 12, 1991.
[Blackshire] was the sole registered occupant of Room A-1129, and the sole focus of the police investigation on August 15, 1991.

* * * * * *
In other words, the circuit court's decision was based on its (1) finding that the police questioned Blackshire when Blackshire was the sole focus of the police investigation for what was found in Room A-1129; and (2) conclusion that the police had probable cause to arrest Blackshire for what was found in Room A-1129. Assuming the police had probable cause to arrest Blackshire for what was found in one or both of the rooms that Blackshire had occupied, however, the police did not question him about having drugs in his room(s).
In light of the above, we now decide if any of the officer's four requests to Blackshire for specific items of information was custodial interrogation.
1. Personal Identity and Identification. When these requests were made, Blackshire was not in custody. These requests were not interrogation because they came within the routine booking question exception.
2. Domicile and Phone Number. When these requests were made, Blackshire was not in custody. These requests were not interrogation because they came within the routine booking question exception.
3. Residence on Maui. When this request was made, Blackshire may have been in custody because the request may have caused a Quino seizure. This request was interrogation. The routine booking exception did not apply because the officer should have known that his question was reasonably likely to elicit an incriminating response.
4. Drugs on Person. When this request was made, Blackshire was in custody because the request caused a Quino seizure. This request was interrogation because the officer should have known that his question was reasonably likely to elicit an incriminating response. United States v. Disla, 805 F.2d 1340, 1347 (9th Cir.1986).
Sergeant Kaaikala's request for Blackshire's permission to search inside Blackshire's bag was not a request for information. Although the content of Blackshire's bag was incriminating, the officer's request for permission to search it was not interrogation. Similarly, Blackshire's answer was "not in itself `evidence of a testimonial or communicative nature[.]'" United States v. Lemon, 550 F.2d 467, 472 (9th Cir.1977) (quoting Schmerber v. California, 384 U.S. 757, 761-64, 86 S.Ct. 1826, 1830, 16 L.Ed.2d 908 (1966)). However, this request for permission to search came while Blackshire was being subjected to custodial interrogation and after Blackshire should have been advised of his Miranda rights.
Based on the above, we conclude that Blackshire's Miranda rights: (1) may have been violated when the State made request No. 3; and (2) were violated (a) when the State made request No. 4, and (b) when Sergeant Kaaikala requested Blackshire's permission to search inside Blackshire's bag. Therefore, the State may have been barred from using Blackshire's answer to request No. 3 to incriminate him and the State was barred from using Blackshire's answer to request No. 4 and the contents of his bag to incriminate him. More significantly, the 1:20 p.m., August 15, 1991 violation of Blackshire's Miranda rights cultivated a poisonous tree. The question is what, if any, poisonous fruit were cultivated.
The police already knew and could otherwise prove that Blackshire had been the last occupant of Room A-1129. Blackshire's answer to the question whether he had drugs on his person does not appear to *744 have been exculpatory or inculpatory. Blackshire's arrest at 1:25 p.m. was based on the search of his bag and this search was conducted with his consent. This consent may have been influenced by the immediately prior violation of Blackshire's Miranda rights. Thereafter, Blackshire was held at the Lahaina Police Station. That night, at 12:30 a.m., after Blackshire was awakened by the police, served with a warrant of arrest and advised of his Miranda rights, Blackshire waived his Miranda rights, was interrogated for thirty or forty-five minutes, made incriminating statements about the offenses for which he had been arrested, was informed of the continuing investigation regarding the contents of the safe in Room A-1129, and declined to discuss that latter matter.
It was the State's burden to prove that any connection between the initial illegality and the subsequently obtained evidence had become so attenuated that any taint placed on the latter by the former was dissipated. State v. Medeiros, 4 Haw.App. 248, 251, 665 P.2d 181, 184 (1983). In other words, it was the State's burden to prove that Blackshire's consents and answers were not poisoned fruit of the poisonous tree. The State did not satisfy its burden.
Accordingly, we affirm the circuit court's December 24, 1991 Order granting defendant Michael Blackshire's September 30, 1991 motion to suppress Blackshire's statements at the Maui Islander Hotel at 1:20 p.m., on August 15, 1991, and to the Maui County Police on or about August 16, 1991, after 12:30 a.m., and any evidence recovered as a result of those statements.

APPEAL NO. 16194
Blackshire appeals the April 24, 1992 Order denying his September 30, 1991 motion to suppress evidence obtained in "Room [A-]1129 at the Maui Islander Hotel on August 15, 1991, and the search of his bag while he was on the lawn of the hotel[.]"
The circuit court's April 24, 1992 findings of fact are in relevant part as follows:
1. On August 8, 1991, [Blackshire] checked in as the sole registrant in room A-1129 at the Maui Islander Resort. [Blackshire] paid cash for his room. Check out time was noon on August 10, 1991. [Blackshire] paid cash on August 10, 1991, to extend his stay to noon on August 12, 1991. [Blackshire] again paid cash on August 12, 1991, extending his stay to noon on August 14, 1991.
2. On August 14, 1991, [Blackshire] called the Maui Islander Resort after check out time of noon and advised the desk clerk that he wanted to extend his stay to August 16, 1991. [Blackshire] told the desk clerk that he would be by to pay for his room at or before 10:00 p.m., on August 14, 1991.
3. On August 14, 1991, following [Blackshire's] phone call to extend his stay and at approximately 1:00 p.m., room A-1129 was pinlocked at the direction of Linda Winters, General Manager of the Maui Islander Resort. Because [Blackshire] was a cash paying customer, he would not be able to get into room A-1129 until he stopped at the front desk and paid his bill.
4. On August 15, 1991, Ms. Winters arrived at work at approximately 9:00 a.m. and was advised by the front desk clerk that [Blackshire] had not paid for room A-1129. Ms. Winters ordered [Blackshire] checked out of room A-1129 as she needed room A-1129, a studio, for the evening of August 15, 1991. After [Blackshire's] personal belongings were removed from room A-1129, the lock on the door was changed and the door was again pinlocked.
5. A Notice to Guests is posted on the back of the door to each room at the Maui Islander Resort advising the guest of the procedure that will be followed if the guest overstays his tenancy and that if the guest does overstay his tenancy, he will be considered a trespasser. [Blackshire] had notice of what would happen to his room and belongings if he exceeded the tenancy period for which he had paid.
* * * * * *
16. Officers David Lake and Michael Kahoohanohano arrived at the Maui Islander *745 Resort at approximately 12:45 p.m. on August 15, 1991. Ms. Winters escorted the officers to room A-1129, opened the door with a key, and entered with the officers. Room A-1129 was unoccupied when Ms. Winters took the officers into the room.
17. At approximately 1:00 p.m., on August 15, 1991, Officer Mark Joaquin arrived at the Maui Islander Resort, room A-1129, with his narcotic detection dog "Anke." Officer Joaquin took "Anke" to the safe to screen it for narcotics; "Anke" alerted to the safe. Officer Joaquin advised Officer Lake that "Anke" had alerted on the safe.
18. At approximately 1:05 p.m., Ms. Winters returned to room A-1129 and advised Officer Lake that [Blackshire] was at the front desk wanting to pay his bill and extend his stay. The front desk clerk allowed [Blackshire] to pay for the night of August 14, 1991, and also for the night of August 15, 1991, even though Ms. Winters had told her not to accept payment but to have [Blackshire] wait.
* * * * * *
23. On August 15, 1991, at approximately 9:15 p.m., Officers Lake, Faaumu, and Kronoski arrived at the Maui Islander to execute the search warrant. The officers were granted entry to room A-1129 by Ms. Linda Winters who stood by while the search warrant was executed. An Elsafe locksmith arrived and unlocked the safe.
24. The officers recovered approximately 235 grams of suspected cocaine, a balance beam scale, and a small plastic measuring cup with suspected cocaine residue from the hotel safe in room A-1129 at the Maui Islander Resort. Ms. Winters signed the inventory of items taken from the safe at approximately 9:40 p.m., on August 15, 1991.
25. Officer Lake subsequently performed a chemical test on the suspected cocaine which was recovered from the hotel safe in room A-1129 at the Maui Islander Resort obtaining a positive chemical reaction indicating the presence of cocaine.

A.
Blackshire challenges only two of the above quoted findings of fact. First, he contends that finding of fact No. 5 is clearly erroneous in part. We agree that finding of fact No. 5 contains an overstatement. The posted Notice to Guest did not expressly advise the guest of the procedure that would be followed if the guest overstayed his license. However, the posted Notice to Guest did quote HRS § 486K-8 as follows:
SECTION 486K-8. Extension of stay provision. Any guest who intentionally continues to occupy an assigned bedroom beyond the scheduled departure without the prior written approval of the keeper, shall be deemed a trespasser.
Second, Blackshire contends that finding of fact No. 18 is clearly erroneous in part. We agree that there is no evidence that Ms. Winters expressly told the front desk clerk not to accept payment from Blackshire. However, there is evidence that when Blackshire appeared at the front desk wanting to pay to extend his stay, Ms. Winters expressly told the front desk clerk to wait and to have Blackshire wait.

B.
The circuit court denied Blackshire's September 30, 1991 motion to suppress on two grounds. The first ground was that Blackshire's license to occupy Room A-1129 had expired, the Maui Islander Resort General Manager lawfully entered and took possession of the room and Blackshire never regained possession of the room. The second ground was that with respect to Room A-1129, nobody at the Maui Islander Resort was acting as an agent or instrument of the Maui Police Department. Blackshire disagrees with both grounds. Our agreement with the first ground moots the second ground.
We agree with Blackshire that
The proper inquiry is thus whether a governmental intrusion of one's reasonable *746 expectation of privacy occurred. State v. Texeira, 62 Haw. 44, 609 P.2d 131 (1980). The defendant's expectation of privacy must be legitimate and means more than a subjective expectation that the activity in which the defendant is engaged will not be discovered. Id. In making this determination, the Hawaii Supreme Court has followed a two-fold test: (1) whether the defendant had exhibited an actual expectation of privacy; and (2) whether the expectation was one which society would deem to be reasonable. Id.

We assume for purposes of this opinion that Blackshire satisfied test No. (1). We agree with the circuit court that Blackshire did not satisfy test No. (2). "[I]t is ordinarily the case that guests in a hotel, ... are mere licensees and not tenants, and that they have only a personal contract and acquire no interest in the realty." 49 Am. Jur.2d Landlord and Tenant § 6 (1970) (citations omitted).
Hotel and motel rooms ... can be the object of Fourth Amendment protection. Such protection, however, is dependent on the right to private occupancy of the roon, since, at the conclusion of the rental period or on checking out, the guest has completely lost his right to use the room and any privacy associated with it. The hotel manager may enter the room or consent to its search upon conclusion of the occupancy period or upon justifiable ejection of the occupant.
1 W. Ringel, Searches & Seizures, Arrests and Confessions, § 8.3(A) (2d ed. 1993) (citations and footnotes omitted).
As stated in the findings of fact, Blackshire was a cash paying guest who paid cash in advance for his license. Consequently, until he paid cash in advance, he had no license. When he paid cash in advance he had a license for the period paid for and for no more.
Prior to the noon, August 14, 1991, expiration of the license to occupy Room A-1129 mutually agreed to between Blackshire and the Maui Islander Resort, Blackshire advised the Maui Islander Resort that on or before 10:00 p.m., on August 14, 1991, he would pay to extend his license to August 16, 1991. The record and the findings do not support Blackshire's contention that his call advising the hotel that he would pay to extend his stay to August 16, 1991, resulted in a lawful agreement to extend his license to occupy Room A-1129 to August 16, 1991. Thus, Blackshire's license either expired at noon on August 14, 1991, and he had a right to acquire a new license to August 16, 1991 by payment therefor, or Blackshire's license was extended to 10:00 p.m., on August 14, 1991, subject to his option to extend it to August 16, 1991 by payment therefor. Either way, the 1:00 p.m., August 14, 1991, pinlocking did not violate Blackshire's right of privacy. When Blackshire did not pay on or before 10:00 p.m., on August 14, 1991, he had no further license to occupy Room A-1129. Thereafter, his expectation of privacy in Room A-1129 was not one which society would deem to be reasonable. United States v. Larson, 760 F.2d 852 (8th Cir.1985), cert. denied, 474 U.S. 849, 106 S.Ct. 143, 88 L.Ed.2d 119 (1985); United States v. Akin, 562 F.2d 459 (7th Cir.1977), cert. denied, 435 U.S. 933, 98 S.Ct. 1509, 55 L.Ed.2d 531 (1978); United States v. Parizo, 514 F.2d 52 (2d Cir.1975). When, at 9:00 a.m., on August 15, 1991, the hotel removed Blackshire's personal belongings from Room A-1129 and changed the lock on the door, Blackshire had no privacy rights in Room A-1129 and the hotel's action was authorized. Watson v. Brown, 67 Haw. 252, 686 P.2d 12 (1984). When, at 1:00 p.m., on August 15, 1991, Anke alerted to the safe in Room A-1129, Blackshire had no privacy rights in Room A-1129.
United States v. Costa, 356 F.Supp. 606 (D.D.C.1973), aff'd, 479 F.2d 921 (D.C.Cir. 1973), held that a hotel manager may not consent to a search of a room several hours after check-out time but before the hotel has removed the occupant's belongings. We disagree with Costa. Moreover, Costa does not support Blackshire's assertion of a right to privacy after 9:00 a.m., on August 15, 1991.
Assuming Blackshire subsequently reacquired his privacy rights in Room A-1129 *747 after the front desk clerk, at about 1:05 p.m., on August 15, 1991, accepted his payment for an occupancy term ending on August 16, 1991, Blackshire's privacy rights were not violated after that reacquisition. The subsequent entry of room A-1129 by the police was authorized by the search warrant.

C.
Blackshire asserts that he continued to have privacy rights in Room A-1129 because he was not ejected pursuant to HRS § 486K-2 (1985). That statutory section, however, must be read with reference to HRS § 486K-8 (1985). See State v. Briones, 71 Haw. 86, 784 P.2d 860 (1989). These two statutes provide in relevant part as follows:
[§ 486K-2] ... All parties indebted for rooms or board in the hotel may be summarily ejected by the keeper thereof from the premises upon the keeper giving to the parties so indebted a written notice of the amount of indebtedness and the keeper's demand for the same[.]
[§ 486K-8] ... Any guest who intentionally continues to occupy an assigned bedroom beyond the scheduled departure without the prior written approval of the keeper, shall be deemed a trespasser.
HRS § 486K-2 applies prior to the hotel guest's scheduled departure. It did not apply to Blackshire because he paid cash in advance for his license to occupy the hotel room. HRS § 486K-8 applies after the hotel guest's scheduled departure.
When Blackshire's personal belongings were removed from Room A-1129 and its doorlock changed, the license to occupy mutually agreed to by Blackshire and the hotel had expired. HRS § 486K-8 applied and, pursuant to it, Blackshire was a trespasser. Upon the expiration of the license mutually agreed to by the hotel guest and the hotel, HRS § 486K-8 permits, and HRS § 486K-2 does not preclude, the hotel from removing the hotel guest's personal belongings from the room and changing the room's doorlock so as to prevent the hotel guest from re-entering the room without the hotel's permission. United States v. Parizo, 514 F.2d at 54.

CONCLUSION
Accordingly, we affirm the circuit court's April 24, 1992 Order denying Blackshire's September 30, 1991 motion to suppress evidence obtained from a "search and seizure of Room A-1129 at the Maui Islander Hotel on August 15, 1991, and the search of his bag while he was on the lawn of the hotel[.]" We affirm the May 6, 1992 judgment convicting Blackshire of Count 3, Promoting a Dangerous Drug in the First Degree, HRS § 712-1241(1)(a)(i); and Count 4, Prohibited Acts Related to Drug Paraphernalia, HRS § 329-43.5(a).
NOTES
[*] Editor's Note: Upon granting certiorari in case No. 16194, the Supreme Court remanded the case to the Intermediate Court of Appeals for reconsideration in light of the allegation it failed to consider findings of fact 5 and 18.