STATE OF HAWAII, Plaintiff–Appellant, v. **HAILA DIANE ROMAN**, Defendant–Appellee

NO. 12986

(CR. NO. 87–0178)

APRIL 11, 1989

LUM, C.J., NAKAMURA, PADGETT,
HAYASHI, AND WAKATSUKI, JJ.

OPINION OF THE COURT BY HAYASHI, J.

Plaintiff–Appellant State of Hawaii (State) appeals the order suppressing the confessions made by Defendant–Appellee Haila Diane Roman (Roman). After using a polygraph examination to verify rape charges filed by Roman, the investigating police officers had suspected that she was lying, questioned her about the accusations without first giving *Miranda v. Arizona*, 384 U.S. 436 (1966) warnings (*Miranda* warnings), and then obtained oral plus written confessions admitting to fabricating the allegations. The trial court had ruled that the police had

improperly interviewed Roman after the polygraph session by failing to issue the required *Miranda* warnings. State contends that the trial court erred because 1) there was no custodial interrogation necessitating *Miranda* warnings; and 2) Roman had received adequate *Miranda* warnings prior to the polygraph testing. We disagree, instead affirm the suppression order, and therefore remand the case for further proceedings.

I.

## BACKGROUND FACTS

The facts are not disputed. On January 5, 1987, Roman, an inmate serving weekends at the Women's Correctional Facility reported having been repeatedly raped by two male Adult Corrections Officers on November 7, 1986, December 9, 1986, December 26, 1986, December 27, 1986, and January 2, 1987. But the investigating Honolulu Police Department (HPD) Detective Leighton Fujinaka (Det. Fujinaka) suspected Roman was lying (based on the inconsistencies in her story plus the lack of corroborating physical evidence) and arranged a polygraph examination to confirm her charges.

On January 15, 1987 at the Beretania Street police station, qualified examiner HPD Detective John Paekukui (Det. Paekukui) went over two standard police forms apprising Roman of her Fifth and Sixth Amendment rights, seeking consent to the polygraph testing, plus telling that the test results would be discussed afterwards. Roman signed the forms. After the questioning had ended, Det. Paekukui reviewed the readings for a few minutes, determined that Roman had not been truthful describing the purported rapes, and confronted her.

As Det. Paekukui later testified at the hearing on the motion to suppress:

> Q. When you informed Ms. Roman that you concluded that she was not being entirely truthful with you, what response did she give, if any?
>
> A. At first, she said that she was telling the whole truth and at that point, she wouldn't make any other statements that she was just telling the truth about what had happened, continued to talk to her about this result of the test, and when I told her that *it appeared that she was carrying a heavy burden because*

*of this test, and that if she would tell the truth, it would prob-
ably make her feel better* instead of feeling this burden. That's
when she asked me to sit down because she wanted to tell me
something. This is when she told me that she lied in the test and
nothing happened and she made everything up [to allay her hus-
band's suspicions about unexplained bruises received while at
the prison].

Transcript of July 10, 1987 1 at 18 (emphasis added).[1]

Det. Paekukui next brought Det. Fujinaka into the examination room
where Roman repeated her confession. Det. Fujinaka thereafter took Ro-
man to another room to have her write down her statement and informed
his superior officer HPD Lieutenant James Neely (Lt. Neely). Lt. Neely
then instructed Det. Fujinaka to arrest Roman for making false accusa-
tions plus tape record her confession.

On February 19, 1987, Roman was charged with violating Hawaii
Revised Statutes § 710–1015 (1985) by filing a false crime report.[2] On
June 15, 1987, the defense moved to suppress all of Roman's confessions
arguing that 1) she had been improperly pressured into talking; 2) no
*Miranda* warnings had issued after the questioning, based on the poly-
graph examination results, had commenced; and 3) the warnings on the
two standard police forms had failed to alert Roman about any post–
testing interrogation. State answered that 1) Roman was not under custo-
dial interrogation but had voluntarily confessed; 2) the two police forms
had adequately explained her *Miranda* rights; plus 3) no unlawful coer-
cion had occurred.

---

[1] There are two transcripts numbered 5340 for the July 10, 1987 suppres-
sion motion hearing. The morning session containing Det. Paekukui's testimony
will be designated as "1." The afternoon session describing the accounts of Det.
Fujinaka plus Roman will be referred to as "2."

[2] The statute provides:

§ **710–1015 False reporting to law–enforcement authorities.** (1) A
person commits the offense of false reporting to law–enforcement authori-
ties if he intentionally makes a report or causes the transmission of a report to
law–enforcement authorities relating to a crime or other incident within their
concern when he knows that the information contained in the report is false.

(2) False reporting to law–enforcement authorities is a misdemeanor.

Det. Fujinaka subsequently testified as follows:

Q During the time Ms. Roman was *in your custody*, Detective, did you ever inform her of her constitutional rights?

A No, I did not.

Q Why not?

A After she had made a spontaneous utterance to me and the polygraph in the presence of Detective Paekukui and myself and after getting her permission to write out her statement on the statement form, my intention was just to close the case for insufficient evidence, because of the deception that was discovered. However, I did inform her in the polygraph room, if I recall correctly, that she may be arrested for making a false report. At that point *I had no indication or intention of placing her under arrest.* Basically, mainly to close the report, while she was writing out her statement form in the interview room I went to look for my lieutenant [Lt. Neely]. I left her alone to inform him of the progress of this particular case. I was unable to locate him at that time. I then returned back to the room. She had just about finished the statement form. I left her again. I found the lieutenant. I informed the lieutenant what had happened. And it was at that point the lieutenant instructed me to place her under arrest for making a false report and also to tape record her written statement.

. . . .

Q What about when Detective Neely told you to arrest her? At that point you intended to arrest her.

A Well, when Lieutenant Neely informed me to arrest her, *at that point I should have warned her of her constitutional rights. But I did not.*

Transcript of July 10, 1987 2 at 8–9, 16 (emphasis added).

On April 19, 1988, the trial court rendered its written decision suppressing Roman's statements by concluding that:

1. As a matter of law, the "WARNING PERSONS TAKING A POLYGRAPH EXAMINATION OF THEIR CONSTITUTIONAL RIGHTS" given to the Defendant before the polygraph examination was insufficient to enable her to knowingly and intelligently waive her rights with regard to the post–test interrogation by Detective Paekukui. *Nothing in the language*

*of the written warning of rights form given to the Defendant explicitly related to interrogation after the polygraph examination.* Furthermore, while the form indicated that the Defendant's words might be used in court, *the form did not indicate that those words might be used against her.* In addition, while the form indicated that the Defendant would be informed of the results of the polygraph test, *it said nothing about any interrogation of the Defendant about those results.* Consequently, the Defendant could not have knowingly and intelligently waived her rights with regard to the post–polygraph interrogation.

Record at 87–88 (emphasis added). The trial court therefore held that a custodial interrogation had begun when Roman became the focus of a false charges investigation, the police detectives had improperly failed to give *Miranda* warnings after the polygraph examination, and the official misconduct had tainted all the statements which had to be suppressed.

State then appealed.

## II.

## QUESTIONS PRESENTED

We will answer the issues as follows:

1. Whether the trial court erred by ruling that a custodial interrogation requiring *Miranda* warnings had taken place? NO.

2. Whether the trial court erred by holding that Roman had not been adequately apprised of her constitutional rights by the two standard police forms? NO.

## III.

## CUSTODIAL INTERROGATION

State maintains that Roman did not undergo any custodial interrogation since the questioning concerned her rape accusations and not her involvement in any other crime, she was free to leave after receiving the polygraph examination results, plus the police detectives did not attempt to incriminate her. Roman counters that the inherently coercive, intimi-

dating situation forced her to admit to the fabrication and amounted to custodial interrogation.

*Miranda* warnings must precede any police questioning which subjugates an individual to the will of the examiner and thereby undermines the privilege against self–incrimination. *State v. Russo*, 67 Haw. 126, 681 P.2d 553 (1984), *appeal after remand*, 69 Haw. ___, 734 P.2d 156 (1987). The test to determine if a custodial interrogation had taken place is whether the investigating officer should have known that his or her words or conduct were reasonably likely to evoke an incriminating response. *State v. Ikaika*, 67 Haw. 563, 698 P.2d 281 (1985).

Here, Roman voluntarily underwent the polygraph testing, was not at first a suspect, so was not initially in custody. *State v. Sugimoto*, 62 Haw. 259, 614 P.2d 386 (1980); *see also State v. Wyatt*, 67 Haw. 293, 687 P.2d 544 (1984). Yet, Det. Paekukui knew about Det. Fujinaka's suspicions, confirmed that Roman had probably lied about the rape incidents, and then encouraged her to tell the truth (i.e. confess to concocting a false story). State does not challenge the trial court's crucial finding that:

12. When Det. Paekukui informed the Defendant of his conclusion, the Defendant initially insisted that she had told the truth about the sexual assaults. Det. Paekukui then questioned the Defendant about the discrepancies between the polygraph test and her statements for about five minutes. At one point Det. Paekukui observed that the Defendant appeared to be carrying a "heavy burden"; *he urged her to unburden herself to him.* The Defendant then said, "Sit down, there's something I want to tell you." The Defendant then made a statement to Det. Paekukui that she had earlier fabricated her reports of being sexually assaulted while a prisoner at the Womens Facility.

Record at 85–86 (emphasis added).

The criminal investigation had now focussed on Roman, and the questioning by Det. Paekukui (and later Det. Fujinaka) became specific as to her misconduct. *See State v. Blanding*, 69 Haw. ___, 752 P.2d 99 (1988). What had originally been a relatively innocuous interview had turned into a custodial interrogation requiring *Miranda* warnings. *See State v. Amorin*, 61 Haw. 356, 604 P.2d 45 (1979).

State, however, declares that 1) neither Det. Paekukui nor Det. Fujinaka had sought to institute any charges based on Roman's admissions (until Lt. Neely's later intervention); 2) the questioning was not

designed to elicit any incriminating evidence; so 3) *Miranda* warnings were unnecessary. *See State v. Paahana*, 66 Haw. 499, 666 P.2d 592 (1983).

But regardless of their initial, actual, subjective intent, the police detectives should have realized that they were essentially asking Roman to confess to the false reporting offense. *See State v. Melemai*, 64 Haw. 479, 643 P.2d 541 (1982). That a subsequent decision by Lt. Neely changed the situation should not excuse the police detectives' initial failure to give *Miranda* warnings. We do not condone any police ignorance about the law and the consequences of a custodial interrogation. *See, e.g., State v. Uganiza*, 68 Haw. 28, 702 P.2d 1352 (1985).

## IV.

## THE POLICE FORMS' MIRANDA WARNINGS

State next advances that 1) the two standard police forms which Roman had signed before submitting to the polygraph test provided sufficient *Miranda* warnings; so 2) she had willingly waived her constitutional rights by confessing. Roman replies that 1) the police forms were inadequate; and 2) there was no knowing, intelligent relinquishment of her *Miranda* rights.

*Miranda* warnings must clearly convey to the accused a full understanding of the applicable constitutional protections: the right to remain silent, that anything said can and will be used against the accused, the right to an attorney present during the questioning, plus an appointed counsel will be offered if needed. *State v. Hong,* 62 Haw. 83, 611 P.2d 595 (1980) (per curiam); *State v. Kalai*, 56 Haw. 366, 537 P.2d 8 (1975). That the defendant read and signed police forms providing *Miranda* warnings prior to confessing may be sufficient to indicate a valid waiver of one's constitutional rights, but the defendant's age, background, intelligence, and situation should be considered. *State v. Kreps*, 4 Haw. App. 72, 661 P.2d 711 (1983); *see State v. Maluia*, 56 Haw. 428, 539 P.2d 1200 (1975).

As the trial court accurately discerned, the forms revealed nothing about a post–testing interrogation leading to a criminal prosecution aris-

ing out of an offense other than the alleged rapes. *Cf. Wyrick v. Fields*, 459 U.S. 42 (1982) (per curiam). This is not an instance where the person under the police questioning was a suspect knowing about being the focus of an investigation and the chance of criminal liability. *See State v. Ramones*, 69 Haw. ___, 744 P.2d 514 (1987); *cf. Colorado v. Spring*, 479 U.S. 564 (1987). Because Roman was not informed about the totally separate false charges problem (although arising out of the inquiry into her rape complaint), the earlier *Miranda* warnings (relating solely to the polygraph examination) were inadequate, so rewarnings specifically pertaining to the subsequent interrogation were mandated. *See State v. Nelson*, 69 Haw. ___, 748 P.2d 365 (1987).

Where the prosecution has not proven that the accused was properly admonished about her constitutional rights, there could be no valid waiver. *See State v. Kaahanui*, 69 Haw. ___, 747 P.2d 1276 (1987). The first improper questioning by Det. Paekukui therefore tainted all of Roman's subsequent confessions, rendering them inadmissible. *See State v. Kim*, 68 Haw. 286, 711 P.2d 1291 (1985).

We agree with the trial court's reasoning that:

2. Although the Defendant came to the police station voluntarily in order to submit to the polygraph examination, when Detective Paekukui began questioning the Defendant after the polygraph examination ended, the Defendant became the subject of a custodial interrogation since at that point she became the central focus of a separate criminal investigation.

3. *Because the Defendant was not re–informed of her Constitutional rights prior to the post–polygraph custodial interrogation, and because the earlier warning and waiver of rights were insufficient with regard to the post–polygraph interrogation,* the State of Hawaii could not demonstrate that it had exercised adequate procedural safeguards to secure the Defendant's privilege against self–incrimination. Consequently, the Defendant's oral statements to Detectives Paekukui and Fujinaka must be suppressed.

4. The Defendant's subsequent written statement must also be suppressed under the "cat out of the bag" doctrine articulated in *United States v. Bayer*, 331 U.S. 532, 540–541[, *reh'g denied*, 332 U.S. 785] (1947), and *State v. Medeiros*, 4 Haw. App. 248[, 665 P.2d 181] (1983) since the Defendant was

not re–informed of her Constitutional rights against self–incrimination prior to making the written statement.
Record at 88 (emphasis added).

## V.

## CONCLUSION

Accordingly based on the above analysis, we affirm the suppression order and remand the case for further proceedings consistent with this opinion.

*Wallace W. Weatherwax* (*Lila B. LeDuc* on the briefs), Deputy Prosecuting Attorneys, for Appellant.

*Anthony K. Bartholomew* (*Brook Hart* with him on the brief; Hart & Wolff, of counsel) for Appellee.