STATE OF HAWAI'I, Plaintiff-Appellee,
v.
REGINALD RANALDO RAMOS, JR., aka Reginald Ranaldo Ramos, Defendant-Appellant
No. 28356.
Intermediate Court of Appeals of Hawaii.
February 6, 2009.
On the briefs:
Peter Van Name Esser Myles S. Breiner for Defendant-Appellant
James M. Anderson Deputy Prosecuting Attorney City and County of Honolulu for Plaintiff-Appelee

MEMORANDUM OPINION
RECKTENWALD, Chief Judge, FOLEY, and NAKAMURA, JJ.
Defendant-Appellant Reginald Ranaldo Ramos, Jr., (Ramos) appeals from the Judgment filed on December 26, 2006, in the Circuit Court of the First Circuit (circuit court)[1] Plaintiff-Appellee State of Hawai`i (State) charged Ramos by indictment with promoting a dangerous drug in the first degree, for knowingly possessing at least one ounce of methamphetamine, in violation of Hawaii Revised Statutes (HRS) § 712-1241(1)(a)(i) (Supp. 2004)[2] (Count I); unlawful methamphetamine trafficking of it least one-eighth ounce of methamphetamine, in violation of HRS § 712-1240.6(2) (Supp. 2004)[3] (Count II); being a felon in possession of a firearm, in violation of HRS §§ 134-7 (b) and (h) Supp. 2004)[4] (Count III); being a felon in possession of ammunition, in violation of HRS §§ 134-7 (b) and (h) (Count IV); and unlawful possession of drug paraphernalia, in violation of HRS § 329-43.5(a) (1993)[5] (Count V). After a jury trial, Ramos was found guilty as charged on all counts. The circuit court sentenced Ramos to terms of imprisonment of twenty years on each of Counts I and II, with a mandatory minimum term of five years on Count II, ten years on each of Counts III and IV, and five years on Count V, all terms to run concurrently.
On appeal, Ramos argues that: 1) the circuit court erred in finding that Ramos's confession was voluntary; 2) the jury instructions on the unlawful methamphetamine trafficking charge were deficient; 3) there was insufficient evidence to show that Ramos trafficked at least one-eighth ounce of methamphetamine; and 4) the circuit court should have sua sponte declared a mistrial or struck testimony relating to Ramos's past criminal activities that Ramos's counsel elicited on cross-examination of the lead police officer. Ramos also asserts that his trial counsel was ineffective for eliciting the past-criminal-activities information on cross-examination and failing request that the circuit court take ameliorative action once the information was elicited.[6]
We hold that: 1) the circuit court did not err in finding that Ramos's confession was voluntary; 2) the circuit court did not commit plain error in failing sua sponte to declare a mistrial or strike the past-criminal-activities testimony elicited by Ramos's counsel; and 3) Ramos's claims of ineffective assistance of counsel are denied without prejudice to Ramos raising such claims in a proceeding under Hawai`i Rules of Penal Procedure (HRPP) Rule 40. We further hold that the methamphetamine-trafficking jury instructions were prejudicially erroneous and that there was insufficient evidence to show that Ramos was involved in trafficking at least one-eighth ounce of methamphetamine. Accordingly, we: 1) vacate the Judgment as to Count II; 2) remand the case for retrial on lesser included Offenses under that count; and 3) affirm the remainder of the Judgment without prejudice to Ramos's raising his claims of ineffective assistance of counsel at a HRPP Rule 40 proceeding.

BACKGROUND

I.
In March of 2005, Officer Chad Aoki was assigned to investigate complaints of drug activity at a residence in Wahiawa. On March 9, 2005, Officer Aoki obtained a warrant to search the residence and the person of Ramos for methamphetamine and evidence of methamphetamine trafficking. On March 10, 2005, shortly after 6:00 a.m., police officers executed the search warrant at the residence.
The residence belonged to James and Alice Cabodol, the parents of Ramos's girlfriend, Juliette Cabodol (Juliette). Ramos had lived at the residence for two years[7] with Juliette, their three-year old son, Juliette's parents, and Juliette's brother.
When the warrant was executed, Ramos, Juliette (who was pregnant), their son, and Juliette's father were present. Juliette's mother arrived at the residence while the police were executing the warrant.
In the second-floor bedroom that Ramos shared with Juliette and their son, the police recovered: 1) three Ziploc bags containing methamphetamine concealed within the base of a lamp on a bedside nightstand; 2) a glass pipe with methamphetamine residue, in a pouch on the floor; 3) a Pyrex Mask with methamphetamine residue, on top of a plastic storage bin; 4) a Ziploc bag containing methamphetamine scrapings and small plastic packets containing methamphetamine, from stacked plastic drawers; 5) a Ziploc bag containing methamphetamine scrapings, from the vents of an air conditioning unit; 6) a plastic packet containing a crystalline substance and residue, from the pocket of pants on the floor; 7) a digital scale on the floor next to the night stand; 8) another digital scale from the plastic drawers; and 9) a functioning surveillance monitor that was connected to cameras showing the area fronting the residence. The aggregate weight of the substances in the bedroom found to contain methamphetamine was over one ounce.
On the first floor of the residence, the police recovered: 1) a semi-automatic firearm and ammunition, from a bag that was found in an entertainment center cabinet; 2) a military ammunition can containing ammunition of various calibers, ammunition magazines, and speed loaders, found to the left of the entertainment center cabinet; 3) shotgun shells located in a cooler to the right of the entertainment center cabinet; and 4) boxes of additional ammunition in the entertainment center cabinet. While the police were executing the search warrant, Ramos informed a police officer that there was a gun belonging to Ramos's friend in the entertainment center cabinet.
Ramos signed a written consent to search a tool shed located in the back yard and two vehicles parked on the premises. The police recovered the following items from the tool shed: a bottle of phosphoric acid, a bottle of acetone, a vacuum flask, a mason jar, glass plates, a baby food jar, a Pyrex measuring cup, a glass flask, and a rubber hose. Two of the containers were found to contain methamphetamine, including a vacuum flask from which Ramos's fingerprint was recovered. The police also recovered the following items from a box in the kitchen on the first floor of the residence: a metal strainer, coffee filters, a clip-on fan, a light, Pyrex glassware, a hotplate, a heat gun, and a metal spoon.
Officer Alvin Vierra was qualified at trial as an expert in the field of clandestine laboratory identification and methamphetamine manufacturing. Officer Vierra had participated in the search of the tool shed. He opined that the items recovered from the tool shed were being used to wash "dirty" methamphetamine so it could be resold. Based on his experience and training, Officer Vierra believed that certain liquids found in containers in the shed resembled a solvent that usually contained methamphetamine. He explained that in a washing operation, crystal methamphetamine with impurities is placed in a solvent, such as acetone, so that it can be broken down into liquid form; the liquid is strained through a filter, such as a coffee filter, to remove the impurities; then the solvent in the cleaned liquid is allowed to evaporate, resulting in the methamphetamine changing back to a crystalized form. Officer Vierra stated that items found in the kitchen, including the coffee filter, glass plates, and heating element, could be used to speed the evaporation process. Officer Vierra opined that the items found in the tool shed and kitchen provided a "classic example of a wash lab or washing of methamphetamine."
As a result of the execution of the search warrant, the police arrested Ramos, Juliette, and Juliette's parents. Ramos waived his Miranda rights and was interviewed at the Wahiawa Police Station. In his statement, Ramos admitted that the items containing methamphetamine or methamphetamine residue found in the bedroom belonged to him, including the three Ziploc bags concealed in the lamp base, the glass pipe, the Pyrex flask, and various Ziploc packets. He also admitted that the surveillance equipment belonged to him and acknowledged that the two digital scales were used to weigh crystal methamphetamine, the Ziploc packets were used to package crystal methamphetamine, and the glass pipe was used to smoke crystal methamphetamine.
Ramos stated that the handgun, which he admitted to "put[ting] away," belonged to a "neighbor," and that the ammunition found in the residence belonged to friends. He also stated that certain items found in the tool shed, which he thought could be used to clean crystal methamphetamine so it could be re-smoked, and items found in the kitchen belonged to friends. Although denying ownership of these items, Ramos stated that he knew these items were present in the residence and tool shed and that he was taking responsibility for them. Ramos asserted that none of the items found during the search belonged to his girlfriend or the other members of her family who lived at the residence.
Juliette and her parents declined to be interviewed by the police. After Ramos gave his statement to the police, Juliette and her parents were released.

II.
At trial, the State's case included the introduction of the foregoing evidence obtained as the result of the search of the residence and tool shed, Officer Vierra's testimony that the items recovered from the tool shed and kitchen were components of a clandestine methamphetamine washing operation, and Ramos's recorded statement.
Ramos's defense was that his confession had been coerced and was false, and that a drug-dealer friend named Michael Durban, who was a frequent visitor to Ramos's residence, cad planted the contraband found during the search. Ramos called witnesses who provided testimony to the effect that Durban was a drug dealer who sold drugs around Ramos's residence, carried packets of methamphetamine similar to what was found during the search, and often went into the residence. Juliette and a neighbor, Kenneth Robellia, testified that on the day before the police executed the warrant, they saw Durban walk upstairs (where Ramos's bedroom was located) with a pouch and stay there for five to ten minutes. They also testified that while in Ramos's residence, Durban sold the gun recovered during the search to a neighbor, Rick Fontes. Juliette testified that Fontes left the gun behind and that Ramos hid the gun in the entertainment center cabinet.
Ramos testified that he only confessed because Officer Aoki told Ramos that if he admitted to everything, the police would let his "family" go.[8] Therefore, he agreed with whatever the police said, even if it was not true. According to Ramos, as he got farther into the interview, he came to his senses and started denying that certain items belonged to him. Ramos denied that any of the contraband introduced at trial belonged to him. He testified that he placed the gun in the entertainment center cabinet and planned to return it to Fontes the next day. He further stated that some of the ammunition found in the residence belonged to Fontes.
Ramos testified that Durban was a drug dealer, was a frequent guest in Ramos's house, and was allowed to use the tool shed. Ramos stated that Durban had been bailed out after being indicted or charged and that Ramos thought Durban was working with the police. Although it was the defense theory that Durban had set Ramos up by planting the methamphetamine and other drug elated contraband, the defense did not establish that Durban was in fact a police informant or that Durban had benefitted from the prosecution of Ramos.

DISCUSSION

I.

A.
Prior to trial, the State filed a motion to determine she voluntariness of Ramos's statement to the police, pursuant to HRS § 621-26 (1993)[9] In his memorandum in opposition to the motion, Ramos asserted that the police had coerced his statement by telling him "that if he refused to give a statement and take responsibility [for the contraband found during the search] his whole family would be charged in this case and he would lose custody of his young son to the Child Protective Services." Ramos also filed a motion to suppress the evidence found through the execution of the search warrant and the consent to search the tool shed. Among other things, Ramos argued that his consent to search had been coerced and that the execution of the warrant had been defective.
The circuit court held a two-day hearing on the State's voluntariness motion and Ramos's motion to suppress evidence.[10] officer Aoki explained the circumstances surrounding the execution of the search warrant and the obtaining of the consent co search from Ramos. Officer Aoki testified that in addition to Ramos, the other adults present in the home during the execution of the warrant were arrested because they were residents of the come and contraband was found in the common areas of the home.
Ramos's counsel cross-examined Officer Aoki about what Officer Aoki had told Ramos before Ramos gave his statement, Officer Aoki denied ever telling Ramos that "if [Ramos] cooperated that [Officer Aoki] would release the other people that were arrested." Officer Aoki acknowledged, however, that prior to the recorded interview, he and Ramos discussed what would happen to the others arrested. Officer Aoki testified as follows:
Q. [(BY RAMOS'S COUNSEL)] Okay. You never told him that if he cooperated that you would release the other people that were arrested?
A. [(OFFICER AOKI)] No. He did ask what's going to happen to everyone else
Q. Uh-huh.
A.  I said whoever we determine or whoever takes responsibility for the drugs will be charged and the rest that we cannot determine had anything to do with the contraband that we found will be released.
Q. Okay. So, did he ask you that before he signed the form?
A. Yes. Off tape.
Q. Off tape before he signed the form?
A. Yes .
Q. So, basically he had asked you or you had stated to him whoever takes responsibility for the contraband that was found will be the one who is charged and everybody else will not be charged?
A. Yes.
Q. Meaning that they would be released?
A. At that time, yes.
Officer Aoki stated that the other people arrested were Ramos's girlfriend and the girlfriend's parents.
Ramos testified that at the police station, prior to giving his statement, the police "told me oh, all I have to do is just take responsibility and they would let everybody go and let my family go." Ramos said that this was the reason he gave the police his statement. He also claimed that at the residence, coring the execution of the search warrant, Officer Aoki and mother officer made similar statements to him and also referred to CPS (Child Protective Services) taking away his son. Ramos acknowledged that while the search was ongoing, his sister-in-law came and took his son. Juliette also testified and corroborated Ramos's version of what happened at the residence.
At the close of the hearing, the circuit court denied Ramos's motion to suppress evidence[11] and ruled that the statement Ramos gave to Officer Aoki at the police station was voluntary. The circuit court subsequently memorialized its decision in a written order which contained the following pertinent findings of fact and conclusions of law:
FINDINGS OF FACT
21. Officer Aoki conducted an interview of Defendant at the police station on March 10, 2005. Defendant was in police custody at the time of this interview.
22. Before the interview began, Officer Aoki asked Defendant if he had any questions.
23. Defendant asked Officer Aoki what will happen to the others who were also arrested. Officer Aoki informed Defendant that whoever is responsible is going to be held and will be held responsible, and whoever is not responsible is not going to be responsible and will not be held responsible.
CONCLUSIONS OF LAW
17. Officer Aoki's response to Defendant's question, that whoever is responsible is going to be responsible and will be held responsible, is not a coercive statement, but rather is a statement of fact and legality, and that the Officer's response was not an inappropriate statement or response.
. . . .
22. Officer Aoki followed proper procedures in obtaining Defendant's waiver of his constitutional rights.
23. Defendant's statement to Officer Aoki made while in custody and under police interrogation was voluntarily made. State v. White, 1 Haw. App. 221, 617 P.2d 98 (1980), State v. Kaahanui, 69 Hawaii 473, 747 P.2d 1276 (1987), State v. Russo, 67 Hawaii 126, 681 P.2d 553 (1984), State v. Roman, 70 Hawaii 351, 772 P.2d 113 (1989).
24. Pursuant to Hawaii Revised Statutes (HRS) 621-26 and Hawaii Rules of Penal Procedure, Defendant's statement to Officer Aoki was made intelligently, knowingly and voluntarily.

B.
Ramos argues that the circuit court erred in finding that Ramos's police-station interview statement was voluntary. We disagree.
The trial court's findings of fact, including facts relating to whether the defendant's statement was voluntary, are reviewed under the "clearly erroneous" standard of review. Dan v. State, 76 Hawai`i 423, 428, 879 P.2d 528, 533 (1994); State v. Gella, 92 Hawai`i 135, 142, 988 P.2d 200, 207 (1999); State v. Villeza, 72 Haw. 327, 330-31, 817 P. 2d 1054, 1056 (1991). A trial court's conclusions of law are reviewed under the right/wrong test. Dan, 76 Hawai`i at 428, 879 P.2d at 533. "Appellate review of whether a defendant's custodial statement to the police is the product of coercion requires us to `examine the entire record and make an independent determination of the ultimate issue of voluntariness' based upon that review and `the totality of circumstances surrounding the defendant's statement. "' State v. Kelekolio, 74 Haw. 479, 502, 849 P.2d 58, 69 (1993) (citation and brackets omitted) .
The prosecution has the burden of showing that the defendant's statement was voluntary. Id. Courts have considered a variety of factors in determining whether a defendant's confession was voluntary under the totality of the circumstances, dome of the factors considered include the defendant's age, education, and intelligence; whether the defendant received prior Miranda warnings; the defendant's mental and physical condition; whether physical punishment such as the deprivation of food or deep had been used; the length and location of the interrogation; and the defendant's prior experience with the criminal justice system and police interrogation. Villeza, 72 Haw. at 331-32, 817 P.2d at 1057; Kelekolio, 74 Haw. at 503, 849 P.2d at 69; Schneckloth v. Bustamonte, 412 U.S. 218, 226 (1973); Withrow v. Williams, 507 U.S. 680, 693-94 (1993); State v. Hill, 14 P.3d 1237, 1245 (Mont. 2000).
Officer Aoki and Ramos presented conflicting testimony on what transpired before Ramos gave his statement. According to officer Aoki, in response to Ramos's question, he simply advised Ramos that whoever the police determined was responsible or whoever took responsibility for the contraband would be charged and the others who the police could not determine were responsible for the contraband would be released. Ramos's testimony, however, indicated that Officer Aoki's statement contained a specific inducement or offer of a quid pro quo that if Ramos took responsibility for the drugs, then the police would release the others that had been arrested.
The circuit court resolved the conflict by finding Officer Aoki's testimony to be credible and accepting his version what transpired. The credibility of witnesses and the weight the evidence is for the trier of fact to determine, not the appellate courts. State v. Buch, 83 Hawai`i 308, 321, 926 P.2d 599, 612 (1996). Given the circuit court's decision to credit officer Aoki's testimony, we conclude that its finding of factthat "Officer Aoki informed Defendant that whoever is responsible is going to be held and will be held responsible, and whoever is riot responsible is not going to be responsible and will not be held responsible"was not clearly erroneous.[12]
Based on the facts found by the circuit court, we conclude that the circuit court did not err in determining that officer Aoki's response to Ramos's question "is not a coercive statement, but rather is a statement of fact and legality." Officer Aoki's comment was "not of a type reasonably likely to procure an untrue statement or to influence an accused to make a confession regardless of guilt." State v. Luton, 83 Hawai`i 443, 457, 927 P.2d 844, 858 (1996) (brackets and ellipsis omitted) (quoting Kelekolio, 74 Haw. at 511, 849 P.2d at 73) .
Ramos contends that even if Officer Aoki did not engage in coercive behavior, Ramos's desire to free his girlfriend and her parents and to keep his son "out of CPS" rendered his statement involuntary. We disagree.
In Roberts v. State, 545 S.W.2d 157 (Tex. Crim. App. 1977), the court held that in the absence of coercive threats or promises by the police, a defendant's belief that his cooperation will benefit a relative will not render his statement involuntary:
A threat made by police officers to arrest or punish a close relative or a promise to free a relative of a prisoner in exchange for a confession may render the prisoner's subsequently made confession inadmissible in evidence. However, where no express or implied promise or threat is made by the police, a prisoner's belief that his cooperation will benefit a relative will not render the prisoner's subsequent confession inadmissible in evidence.
Even when police have made a vague promise to see "what could be done" about freeing a prisoner's friends, it did not render a confession made subsequently inadmissible when the subject of leniency for the friends was introduced initially by the prisoner and not the police.
When a prisoner has created conditions which place an innocent relative under suspicion and the prisoner desires to extricate the relative from this position by making a confession and the confession is self-motivated, it may [be] deem[ed] voluntary and admissible in evidence.
Id. at 161 (citations omitted) . Roberts supports our conclusion that any desire by Ramos to benefit members of his family did not tender his statement involuntary. In our view, Ramos's decision to make a statement to the police was self-motivated and voluntary.
We also note that Ramos does not contend that the police lacked probable cause to arrest his girlfriend and her parents.[13] Other courts have concluded that the arrest of, or threat to arrest, people close to the defendant for whom the police have probable cause to arrest does not render the defendant's statement involuntary. Armstead v. State, 978 So. 2d 642, 648 (Miss. 2008); People v. Gonsalves, 80 Cal. Rptr. 340, 343 (Cal. Ct. App. 1969); Newland v. Hall, 527 F.3d 1162, 1189 (11th Cir. 2008). A contrary rule would hinder the ability of the police to interview a suspect whenever others close to the suspect are also arrested.
In any event, Ramos's interview statement itself belies his claim that his statement was coerced and his free will overborne by his concern for his family and the need to placate Officer Aoki. Ramos did not admit that all the contraband recovered by the police belonged to him. Rather, he was selective in stating that only certain items belonged to him while other items belonged to his neighbor or friends. This selectivity demonstrates that Ramos was able to exercise free will in dealing with the police.
With respect to Ramos's alleged concerns regarding his son and the involvement of CPS, Ramos referred to those concerns in connection with his claim that his consent to search was involuntary. In concluding that Ramos's consent to search was voluntary, the circuit court appears to have implicitly rejected Ramos's contention that his cooperation with the police was coerced by concerns regarding his son. Moreover, Ramos admitted that while the police were executing the search warrant, his sister-in-law came and got his son. Thus, there was no immediacy to Ramos's concern that his son might be placed in the hands of strangers.
Other relevant factors support the circuit court's determination that Ramos's statement was not coerced. Ramos was thirty-eight years old, had graduated from high school, had never been treated for mental problems, and had prior experience with she police and the criminal justice system. He was advised of and waived his Miranda rights. The interview was relatively short, twenty-two minutes in duration, and there is no indication that Ramos was experiencing any sort of physical discomfort. Ramos was provided a "meaningful choice between confessing and remaining silent," State v. Bowe, 77 Hawai`i 51, 59, 881 P.2d 538, 546 (1994), and Ramos's free will was not overborne by "external influence [s] exerted in obtaining [his statement] ." Id. at 57, 881 P.2d at 544. Under the totality of circumstances, we uphold the circuit court's determination that Ramos's statement was voluntary.

C.
Finally, we reject Ramos's claim that the circuit court improperly placed the burden of proving the voluntariness of his statement on him, rather than on the State. In support of his claim, Ramos quotes out of context the prosecutor's references to Ramos's having the burden of proof, which Ramos contends the circuit court accepted. The circuit court held a hearing on both the State's motion to determine the voluntariness of Ramos's statement and on Ramos's motion to suppress evidence. Ramos had the burden of proof on his motion to suppress. Ramos relies on references by the prosecutor that appear to pertain to Ramos's burden of proof on his suppression motion. For example, Ramos quotes from the following passage:
THE COURT: You can step down, Officer Fong. Thank you. Any other witnesses the State is calling on [defense counsel's] motion?
[PROSECUTOR]: No, Your Honor. It is his burden.
THE COURT: Okay. You're helping out, though, everybody appreciates it.
In connection with its motion to determine the voluntariness of Ramos's statement, the State submitted a memorandum of law which correctly acknowledges that the prosecution has the burden of proving the voluntariness of a defendant's statement. The State's memorandum includes the following quote from Kelekolio, 74 Haw. at 502, 849 P.2d at 69: "the burden is on the prosecution to show that the statement was voluntarily given and not the product of coercion." In our review of the record, we find nothing to support Ramos's claim that the circuit court erroneously believed that Ramos had the burden of proof on the voluntariness issue. Absent such evidence, we will not presume that the circuit court misapplied the law.

II .

A.
Ramos was charged in Count II with unlawful methamphetamine trafficking, for "manufactur[ing], distribut[ing], dispens[ing], or possess[ing] with intent to manufacture, distribute, or dispense... substances of an aggregate weight of one-eighth ounce or more of methamphetamine," in violation of HRS § 712-1240.6(2). At trial, the State relied on evidence recovered from the tool shed and kitchen, which its expert testified were components of a clandestine methamphetamine laboratory, to prove Count II.
Ramos argues that the jury instructions on Count II were prejudicially erroneous because they did not require the jury to find the weight element, namely, that Ramos knowingly Trafficked at least one-eighth ounce of methamphetamine. He further argues that the State failed to introduce sufficient evidence to prove the weight element for Count II because no evidence was adduced regarding the weight of the methamphetamine recovered from the tool shed, which was the only methamphetamine associated with the clandestine methamphetamine laboratory. The State concedes error on both these points, and we agree.
While recognizing that the conviction on Count II cannot stand, the State urges us to remand for an entry of judgment of conviction on unlawful methamphetamine trafficking in violation of HRS § 712-1240.6(3) (Supp. 2004),[14] which it asserts is a lesser included offense of the charged HRS § 712-1240.6(2) offense. The State argues that the instructions on Count II set out the necessary elements for the HRS § 712-1240.6(3) offense. One State further argues that the trial evidence established that Ramos violated the HRS § 712-1240.6(3) offense because the evidence overwhelmingly showed that Ramos "manufactured or possessed with intent to manufacture" an aggregate of less than one-eighth ounce of methamphetamine.
As explained below, although we conclude that HRS § 712-1240.6(3) is a lesser included offense of HRS § 712-1240.6(2), the HRS § 712-1240.6(3) offense cannot be established by showing that the defendant possessed with intent to manufacture less than one-eighth ounce of methamphetamine. The circuit court's jury instructions on Count II included possession with intent to manufacture as a possible means of committing the charged HRS § 712-1240.6(2) offense. Thus, the jury's guilty verdict on Count II does not necessarily mean that it found sufficient evidence to convict Ramos of violating HRS § 712-1240.6 (3). Accordingly, it would be improper for us to remand the case for entry of judgment of conviction on the lesser included HRS § 712-1240.6(3) offense on Count II. Instead, we remand the case for a retrial on the lesser included offense of the knowing manufacture of less than one-eighth ounce of methamphetamine and any offense included therein.

B.
At the time relevant to this case, HRS § 712-1240.6 (Supp. 2004) provided in relevant part:
(1) A person commits the offense of unlawful methamphetamine trafficking if the person knowingly manufactures, distributes, dispenses, or possesses with intent to manufacture, distribute or dispense, one or more preparations, compounds, mixtures, or substances of methamphetamine, or any of its salts, isomers, and salts of isomers .
(2) The manufacture, distribution, or dispensing of or possession with intent to manufacture, distribute, or dispense one or more preparations, compounds, mixtures, or substances of an aggregate weight of one-eighth ounce or more of methamphetamine, or any of its salts, isomers, and salts of isomers is a class A felony with a mandatory minimum prison term of five years;....
(3) The manufacture, distribution, or dispensing of one or more preparations, compounds, mixtures, or substances of an aggregate weight of less than one-eighth ounce of methamphetamine, or any of its salts, isomers, and salts of isomers is a class B felony with a mandatory minimum prison term of three years;....
(Emphases added.)[15]
HRS § 712-1240.6(1) defines unlawful methamphetamine trafficking to encompass manufacturing, distributing, and dispensing methamphetamine as well as possessing with intent to manufacture, distribute, or dispense methamphetamine. However, HRS § 712-1240.6 only punishes possessing with intent to manufacture, distribute, or dispense one-eighth ounce or more of methamphetamine; it does not punish possessing with intent to manufacture, distribute, or dispense less than one-eighth ounce of methamphetamine. HRS §§ 712-1240.6(2) and 712-1240.6(3).
HRS § 712-1240.6(2) provides that "[t]he manufacture, distribution, or dispensing of or possession with intent to manufacture, distribute, or dispense one or more preparations, compounds, mixtures, or substances of an aggregate weight of one-eighth ounce or more of methamphetamine" is a class A felony. Emphases added.) HRS § 712-1240.6(3) provides that "[t]he manufacture, distribution, or dispensing of one or more preparations, compounds, mixtures, or substances of an aggregate weight of less than one-eighth ounce of methamphetamine" is a class B felony. (Emphases added.) Conspicuously missing from HRS § 712-1240.6(3) is any reference to "possession with intent to manufacture, distribute, or dispense." HRS § 712-1240.6 does not provide for any offense below a class B felony. Thus, under the plain reading of the statute, only the possession of one-eighth ounce or more of methamphetamine can form the basis for a methamphetamine trafficking charge under HRS § 712-1240.6 where such possession is with the intent to manufacture, distribute, or dispense methamphetamine. Possession of less than one-eighth ounce of methamphetamine does not provide the basis for a methamphetamine trafficking charge under HRS § 712-1240.6 regardless of the intent with which such methamphetamine was possessed.
The circuit court's instructions on Count II included possession with intent to manufacture as a possible means of committing the charged HRS § 712-1240.6(2) offense. The State argued in closing that Ramos was guilty of Count II because he either manufactured methamphetamine or possessed with intent to manufacture methamphetamine. Thus, in finding Ramos guilty of Count II, the jury may have based its decision on a finding that Ramos possessed with intent to manufacture methamphetamine. However, possession with intent to manufacture less than one-eighth ounce of methamphetamine does not violate HRS § 712-124 1240.6(3). Therefore, the jury's guilty verdict on Count II does not necessarily support the entry of judgment of conviction on he offense set forth in HRS § 712-1240.6(3).
Although the foregoing analysis demonstrates that HRS § 712-1240.6(3) is not a lesser included offense of HRS § 712-1240.6(2) under HRS § 701-109 (4) (a) (1993), we conclude that HRS § 712-1240.6(3) is a lesser included offense of HRS § 712-1240.6(2) under HRS § 701-109 (4) (c).[16] Under HRS § 701-109(4)(c), an offense is an included offense when "[i]t differs from the offense charged only in the respect that a less serious injury or risk of injury to the... public interest... suffices to establish its commission." The terms and structure of HRS § 712-1240.6 demonstrate that the Legislature determined that: 1) the injury or risk of injury to the public interest from possessing with intent to manufacture, distribute, or dispense one-eighth ounce or more of methamphetamine was equal to that of manufacturing, distributing, or dispensing of one-eighth ounce or more of methamphetamine; and 2) the injury or risk of injury to the public interest from manufacturing, distributing, or dispensing of less than one-eighth ounce of methamphetamine was less serious than that of manufacturing, distributing, or dispensing of one-eighth ounce or more of methamphetamine. It therefore follows that the Legislature determined that the injury or risk of injury to the public interest from manufacturing, distributing, or dispensing of less than one-eighth ounce of methamphetamine was less serious than that of possessing with intent to manufacture, distribute, or dispense one-eighth ounce or more of methamphetamine. HRS § 712-1240.6(3), a class B felony, is of a lower class and grade and is thus a lesser offense than HRS § 712-1240.6(2), which is a class A felony. See State v. Wallace, 80 Hawai`i 382, 415, 910 P.2d 695, 728 (1996). Accordingly, HRS § 712-1240.6(3) is a lesser included offense of HRS § 712-1240.6(2) under HRS § 701-10 9 (4) (c).
With respect to Count II, the State did not offer evidence that Ramos distributed or dispensed methamphetamine, but Only that he manufactured methamphetamine. Thus on remand, the State will be limited to a retrial on the lesser included offenses of violating HRS § 712-1240.6(3) by means of the knowing manufacture of less than one-eighth ounce of methamphetamine and any offense included therein. See State v. Malufau, 80 Hawai`i 126, 134, 138, 906 P.2d 612, 620, 624 (1995); Wallace, 80 Hawai`i at 414-15, 910 P.2d at 727-28.

III.
Ramos argues that the circuit court plainly erred in mailing to sua sponte declare a mistrial or strike testimony when Ramos's counsel elicited information relating to Ramos's past criminal activities in cross-examining Officer Aoki. There are two incidents cited by Ramos. The first involved defense counsel's apparent attempt to show that Officer Aoki's release of Juliette and her parents, after Ramos gave his statement, demonstrated that Officer Aoki had indeed induced Ramos's confession by promising to release Ramos's family if Ramos confessed. Officer Aoki testified that the different treatment of Ramos and the others was based on the charging criteria used by the police. When defense counsel asked Officer Aoki to explain the criteria he used in deciding to charge Ramos, Officer Aoki replied, "a number of convictions within a certain time, that would fall under career criminal criteria." The pertinent portion of defense counsel's cross-examination is as follows:
Q. BY [DEFENSE COUNSEL] Officer, if Mr. Ramos did not make a statement, would you have released Julliet [sic] and [Juliette's father]?
A. [(OFFICER AOKI)] Yes.
Q. You would have? Why is that?
[PROSECUTOR]: Objection, Your Honor. Relevance.
THE COURT: Overruled.
A. [OFFICER AOKI]: Because, urn, Reginald, the defendant, would have fit under our charging criteria whereas Julliet [sic] and [Juliette's father] wouldn't have.
Q. BY [DEFENSE COUNSEL]: Okay. Now getting to a point in fact, isn't it true that Julliet [sic] and [Juliette's father] was released after Mr. Ramos gave the statement?
A. I believe so.
Q. Okay. So they weren't released before?
A. No.
Q. And in fact they were arrested at the scene; correct?
A. Yes.
Q. And they were released only after Mr. Ramos gave a statement?
A. After I interviewed everyone.
Q. After you interviewed everybody?
A. Yes.
Q. Okay. Who else gave statements?
A. Uh, none of the other people that got arrested gave statements. They refused to give statements.
Q. Yes.
A. But after I read them their rights, all of them 
Q. Um-hmm.
A. it wasn't until then that they were being released.
Q. But you only released Julliet[ sic] and
[Juliette's father] after Mr. Ramos gave a statement?
A. Yes.
Q. And in fact after the end of the statement isn't it correct that you asked him whether or not Julliet [sic] and [Juliette's father] have anything to do with this case you say?
A. I believe so.
Q. Why would you ask him that?
A. I believe Sergeant Ishikawa asked that
question 
Q. Uh-huh.
A.  and to see if anybody else did indeed have ownership to the items we found or were responsible for them.
. . . .
Q. What is the profile that you look at that you mentioned earlier that you were going to charge Mr. Ramos under?
A. Um, a number of convictions within a certain time, that would fall under career criminal criteria.
Q. Couldn't that have been determined at the scene?
A. What is that?
Q. The number of convictions a person has?
A. No. I wouldn't have had that information with me at the scene.
Q. Do you collect people's birth dates and Social Security numbers at the scene?
A. Uh, yes.
Q. Could you have called it in at that time?
A. Uh, I could have.
Q. Okay. And you didn't?
A. No.
Q. You just arrested everybody?
A. Yes.
Emphases added. )
The second incident involved defense counsel's apparent attempt to show that Mike Durban, one of Ramos's friends and a frequent visitor to Ramos's residence, was responsible for the methamphetamine and methamphetamine-related evidence found during the search of the residence and tool shed. In opening statement, defense counsel had stated that Durban was a known drug dealer in the area who sold drugs on Ramos's property, that Durban had gotten into trouble with the police and become a police informant, that Durban had set up Ramos by planting the contraband in Ramos's residence in order to obtain favorable treatment from the police, and that Durban had stored things in the tool shed.
On direct examination, Officer Aoki testified that he had been assigned to investigate complaints of drug activity at Ramos's residence and had applied for a search warrant as part of that investigation. On cross-examination, defense counsel asked Officer Aoki about the information he had received and whether it included Durban. Officer Aoki stated that he had received information that Ramos was selling methamphetamine out of the residence and that he was not familiar with Durban. The pertinent portion of the cross-examination is as follows:
Q. [(BY DEFENSE COUNSEL)] Okay. Now you had mentioned that you had received information on drug activity in the area or at Mr. Ramos' residence.
A. [(OFFICER AOKI)] Yes.
Q. What kind of information was that?
A. That methamphetamine was being sold out of the residence.
Q. Okay. By who?
A. By the defendant.
Q. By the defendant. What about a Mr. Mike Durban?
A. That didn't come up.
Q. Do you know who Mr. Mike Durban is?
A. I don't know Mr. Durban.
Q. Not at all?
A. No. Not Durban.
Defense counsel did not move for a mistrial or to strike Officer Aoki's testimony after either of the two incidents. We therefore review Ramos's claim that the circuit court erred in failing to sua sponte take these steps for plain error. The appellate courts "will apply the plain error standard of review to correct errors which seriously affect the fairness, integrity, or public reputation of judicial proceedings, to serve he ends of justice, and to prevent the denial of fundamental rights." State v. Vanstory, 91 Hawai`i 33, 42, 979 P.2d 1059, 1068 (1999) (internal quotation marks and citation omitted). The Hawai`i Supreme Court has stated:
This court's power to deal with plain error is one to be exercised sparingly and with caution because the plain error rule represents a departure from a presupposition of the adversary systemthat a party must look to his or her counsel for protection and bear the cost of counsel's mistakes.
Id. (quoting Kelekolio, 74 Haw. at 514-15, 849 P.2d at 74-75).
Ordinarily, a defendant cannot claim he was prejudiced by or obtain reversal on an error that he invited. State v. Puaoi, 78 Hawai`i 185, 189, 891 P.2d 272, 276 (1995); State v. Smith, 68 Haw. 304, 313, 712 P.2d 496, 502 (1986); State v. Jennings, 430 S.E.2d 188, 200 (N.C. 1993). Here, Ramos, through his counsel, elicited the testimony referring to Ramos's past criminal activities of which Ramos now complains. Officer Aoki's testimony was responsive to the questions asked by Ramos's counsel.
Moreover, the jury had already been exposed to information that Ramos had a prior criminal record in connection with Ramos's felon-in-possession charges. The jury was also ware that the evidence obtained in the case was pursuant to a search warrant issued for Ramos's residence. The State presented compelling evidence of Ramos's guilt based on the plethora of evidence seized from his residence as well as Ramos's confession. Under these circumstances, we conclude that any error in the circuit court's failure to sua sponte declare a mistrial or strike Officer Aoki' s testimony did not rise to the level of plain error.

IV.
Errors invited by defense counsel may constitute ineffective assistance of counsel. See Smith, 68 Haw. at 313, 712 P. 2d at 502. Ramos contends that his trial counsel provided effective assistance in eliciting the information referring to Ramos's past criminal activities from Officer Aoki on cross-examination and in failing to pursue ameliorative action. We conclude that the record is insufficient to resolve these claims on appeal primarily because Ramos's trial counsel did not have an opportunity to explain trial counsel's reasons for the alleged ineffective decisions he made at trial. See State v. Silva, 75 Haw. 419, 439, 864 P.2d 583, 592-93 (1993) .
As noted, the State presented strong evidence of Ramos's guilt, including the discovery of numerous packets containing over one ounce of methamphetamine, digital scales, and surveillance equipment in Ramos's bedroom; the discovery of the components necessary for a clandestine methamphetamine laboratory in the tool shed and kitchen; Ramos's fingerprint on a flask containing methamphetamine found in the tool shed; and Ramos's confession. Faced with such evidence, Ramos's counsel may have decided it was necessary to "take chances" in cross-examining Officer Aoki in the hopes of uncovering discrepancies and evidence that would permit counsel to impeach Officer Aoki's tastimony and cast doubt on Officer Aoki's credibility.
The tactical decisions of defense counsel at trial generally will not be questioned by a reviewing court." Id. at 441, 864 P.2d at 593. "Lawyers require and are permitted broad latitude to make on-the-spot strategic choices in the course of trying a case." Id.
In this case, the record does not contain an explanation from Ramos's trial counsel regarding why he chose to pursue the lines of inquiry which elicited the testimony of Officer Aoki in issue. We conclude that the record is not efficiently developed for us to decide whether the decisions and actions of trial counsel alleged by Ramos to be deficient were pursuant to a legitimate trial strategy and within the range of competence demanded of attorneys in criminal cases. See id. at 439-41, 864 P.2d at 593. Additional input from the trial participants may also shed further light on whether any of trial counsel's alleged errors resulted in the withdrawal or substantial impairment of a potentially meritorious defense. See Id. at 440, 864 P.2d at 593. Accordingly, we deny Ramos's claims of ineffective assistance of counsel without prejudice to Ramos raising such claims at a HRPP Rule 40 proceeding.

CONCLUSION
We vacate the December 26, 2006, Judgment of the circuit court as to Count II, and we remand the case: 1) for retrial on the lesser included offense of violating HRS § 712-1240.6(3) by means of manufacturing methamphetamine and any offense included therein; and 2) for further proceedings consistent with this opinion. We affirm the remainder of the Judgment without prejudice to Ramos's raising his claims of Ineffective assistance of counsel at a HRPP Rule 40 proceeding.
NOTES
[1] The Honorable Steven S. Aim presided.
[2] At the time relevant to this case, HRS § 712-1241(1) (a) (i) (Supp. 2004) provided, in relevant part:

(1) A person commits the offense of promoting a dangerous drug in the first degree if the person knowingly:
(a) Possesses one or more preparations, compounds, mixtures, or substances of an aggregate weight of:
(i) One ounce or more, containing methamphetamine ... or any of [its] . . . salts, isomers, and salts of isomers [.]
[3] At the time relevant to this case, HRS § 712-1240.6 (Supp. 2004) provided in relevant part:

(1) A person commits the offense of unlawful methamphetamine trafficking if the person knowingly manufactures, distributes, dispenses, or possesses with intent to manufacture, distribute or dispense, one or more preparations, compounds, mixtures, or substances of methamphetamine, or any of its salts, isomers, and salts of isomers.
(2) The manufacture, distribution, or dispensing of or possession with intent to manufacture, distribute, or dispense one or more preparations, compounds, mixtures, or substances of an aggregate weight of one-eighth ounce or more of methamphetamine, or any of its salts, isomers, and salts of isomers is a class A felony with a mandatory minimum prison term of five years[.]
[4] At the time relevant to this case, HRS §§ 134-7(b) and (h) (Supp. 2004) provided in relevant part:

(b) No person who... has been convicted in this State or elsewhere of having committed a felony ... shall own, possess, or control any firearm or ammunition therefor.
(h)... any felon violating subsection (b) shall be guilty of a class B felony.
[5] HRS § 329-43.5 (a) (1993) provides in relevant part:

(a) It is unlawful for any person to use, or to possess with intent to use, drug paraphernalia to plant, propagate, cultivate, grow, harvest, manufacture, compound, convert, produce, process, prepare, test, analyze, pack, repack, store, contain, conceal, inject, ingest, inhale, or otherwise introduce into the human body a controlled substance in violation of this chapter.
[6] Ramos further claims that his counsel was ineffective for failing to object to the methamphetamine trafficking instructions. We need not and will not separately address this claim in light of our analysis regarding whether the instructions were prejudicially erroneous.
[7] There was conflicting evidence present at trial regarding the extent which Ramos lived at the residence. In his statement to the police, Ramos provided the Wahiawa residence as his "home address" and said he had lived sere for about two years. At trial, Ramos and Juliette testified that Ramos only lived at the residence on a part-time basis, three or four days a week. They both testified, however, that Ramos had been staying at the residence for the entire week preceding the search.
[8] Ramos referred to his girlfriend Juliette and her parents as members his family and referred to Juliette's parents as his father- and mother-in law.
[9] HRS § 621-26 (1993) provides: "No confession shall be received in evidence unless it is first made to appear to the judge before whom the case is being tried that the confession was in fact voluntarily made."
[10] Although the hearing transcripts reflect that only Ramos's motion to oppress evidence was referenced when the case was called, the evidence presented at the hearing, the parties' arguments, and the circuit court's rulings encompassed both motions.
[11] Ramos does not challenge the circuit court's denial of his motion to oppress evidence on appeal.
[12] We reject Ramos's claim that the circuit court's finding was clearly erroneous because it mischaracterizes the statement made by Officer Aoki. While not a verbatim quotation of Officer Aoki's testimony, the circuit court's finding captures the material substance of Officer Aoki's testimony.
[13] In addition to the evidence admitted at trial, the record indicates that police recovered packets containing residue and a crystalline substance on the kitchen table, which Ramos later stated contained crystal methamphetamine.
[14] The relevant portions of HRS § 712-1240.6(3) (Supp. 2004) are quoted infra in DISCUSSION Section II. B.
[15] Subsections under HRS § 712-1240.6(2) and HRS § 712-1240.6(3) provide for increased maximum terms of imprisonment or mandatory minimum terms if certain aggravating factors are established, such as the defendant's having a prior felony drug conviction or death or serious bodily injury to any person other than the defendant results from the offense.

HRS § 712-1240.6 was repealed effective June 22, 2006, by 2006 Haw. Sess. L. Act 230, § 50.
[16] HRS § 701-109(4) (1993) provides:

(4) A defendant may be convicted of an offense included in an offense charged in the indictment or the information. An offense is so included when:
(a) It is established by proof of the same or less than all the facts required to establish the commission of the offense charged; or
(b) It consists of an attempt to commit the offense charged or to commit an offense otherwise included therein; or
(c) It differs from the offense charged only in the respect that a less serious injury or risk of injury to the same person, property, or public interest or a different state of mind indicating lesser degree of culpability suffices to establish its commission.
(Emphasis added.)